## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**Case No.:**

GIGLIO SUB s.n.c., an Italian General
Partnership, FRANCESCO ONIDA, an
individual,

          **Plaintiffs,**

vs.

CARNIVAL CORPORATION, a Florida Foreign
Corporation, a/k/a CARNIVAL CRUISE LINES,
CARNIVAL plc, COSTA CRUISE LINES, INC.,
a Florida Corporation, COSTA CROCIERE
S.P.A. COMPANY, JOHN DOES, JOHN DOES,
INC.,

          **Defendants.**

_____/

## CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiffs, GIGLIO SUB s.n.c., by and through its representative Adamo Mattera, and FRANCESCO ONIDA, on behalf of themselves and as representatives of all others similarly situated, allege, upon personal knowledge as to themselves and information and belief as to others, as follows:

## JURISDICTION & VENUE

1.　　This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state or foreign state diverse from Defendants, the proposed class seeks in the aggregate more than $5,000,000, exclusive of costs and interest, and more than two-thirds of the members of the proposed class are not residents of the state of Florida.

2.      Venue is proper under 28 U.S.C. § 1391 because one or more Defendants who caused injury reside in this judicial district, and all Defendants are residents of the State of Florida within the meaning of 28 U.S.C. § 1391(c)(2).  Venue is also proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

3.      Plaintiff GIGLIO SUB s.n.c. ("Giglio Sub") is an Italian General Partnership, having its principal place of business in Giglio Island (or Isola del Giglio), in the nation of Italy. Adamo Mattera is a Partner of the General Partnership, and authorized representative of the same.  Giglio Sub predominantly engages in the business of renting small boats, sale of fishing and boating products, and diving equipment rental.  As such, for the services it offers and its profitability, Giglio Sub relies on the natural resources found on Giglio Island, including natural scenery, fish and other aquatic life, as well as on tourism to the island.  Plaintiff Giglio Sub has already suffered lost income and higher costs as a result of the *Costa Concordia* Disaster, and will continue to do so as the effects of the disaster continue and worsen.  As a result of the events described herein, Plaintiff Giglio Sub has suffered ascertainable losses and damages.

4.      Plaintiff FRANCESCO ONIDA ("Onida") is an individual, doing business as a sole proprietor, having his principal place of business in Giglio Island, in the nation of Italy. Onida is in the business of boat taxi, tourist excursions of the island, and the rental of boats.  For the services he offers and his profitability, he also relies on the natural resources found on Giglio Island, including natural scenery, fish and other aquatic life, as well as on tourism to the island. Plaintiff Onida has already suffered lost income and higher costs as a result of the *Costa Concordia* Disaster, and will continue to do so as the effects of the disaster continue and worsen. As a result of the events described herein, Plaintiff Onida has suffered ascertainable losses and damages.

5.      Plaintiffs Giglio Sub and Onida shall be referred to collectively throughout this Complaint as the "Plaintiffs" or "Class Plaintiffs."

6.      Plaintiffs and the class they seek to represent are fishermen, property owners, business owners, and wage earners on Giglio Island in Italy.  Plaintiffs bring this class action on behalf of themselves and all others similarly situated against Defendants for losses and damages arising out of the catastrophic and avoidable disaster of the *Costa Concordia*.

7.      Defendant, CARNIVAL CORPORATION ("Carnival"), a/k/a CARNIVAL CRUISE LINES, is a Panamanian corporation and is registered as a Florida foreign corporation with its principal place of business in Miami, Florida.  CARNIVAL CRUISE LINES is a trademark or brand name.  Carnival conducts substantial and not isolated business in Miami-Dade County, Florida.

8.      Defendant, CARNIVAL plc ("Carnival plc"), is incorporated in England and Wales and is a dual listed company with headquarters and principal places of business in Southampton and London, England and Miami, Florida, USA.

9.      Carnival and Carnival plc operate a dual listed company, whereby the businesses of Carnival and Carnival plc are combined through a number of contracts and through provisions in Carnival's Articles of Incorporation and By-Laws and Carnival plc's Articles of Association. The two companies operate as if they are a single economic enterprise.  The constituent corporation and plc are separate listed companies and each has different shareholder bodies, but they jointly own all of the operating companies in the group, which include:  Carnival Cruise Lines (23 ships); Princess Cruises (17 ships); Holland America Line (15 ships); Costa (15 ships); P&O Cruises (7 ships); Cunard (3 ships); Seabourn (5 ships); AIDA (8 ships); P&O Cruises Australia (3 ships); Iberocruceros (4 ships); Holland America Princess Alaska Tours (Tour Operation).

10.     Defendant COSTA CRUISE LINES, INC. ("Costa Cruise Lines") is a Florida corporation with its principal place of business in Hollywood, Florida.  Upon information and belief, Costa Cruise Lines is a wholly owned subsidiary of Carnival and is also a brand name.

11.     Defendant COSTA CROCIERE S.P.A. COMPANY ("Costa Crociere"), is an Italian corporation and, upon information and belief, is a wholly owned subsidiary of Carnival. Costa Crociere has applied for and received a certificate of authority from the Florida Department of State to transact business in this state.  Costa Crociere engages in business and maintains an office and registered agent in Florida.

12.     Defendants Carnival, Carnival plc, Costa Cruise Lines, Inc., and Costa Crociere shall be referred to collectively throughout this Complaint as the "Defendants."

13.     JOHN DOES, (5-25) currently unknown individual Defendants.

14.     JOHN DOES (26-50) currently unknown corporate Defendants.


## FACTUAL ALLEGATIONS

15.     This is an action brought by and on behalf of the fishermen, business owners, property owners, and wage earners affected by the *Costa Concordia* cruise ship disaster, a catastrophe of historic proportions brought on by, among other things, Defendants' ill-conceived and inadequate policies, procedures, business practices and training, their tolerance and apparent encouragement of a dangerous and reckless practice of taking a ship off course to perform a "sail-by-salute," and their retention of an unqualified and reckless ship captain known by Defendants to have insufficient experience, a poor safety record, and a reputation for being irresponsible and careless.


A.      **The *Costa Concordia* Disaster**

16.     On information and belief, the *Costa Concordia*, the third largest vessel in Carnival Cruise Line's European Costa Cruise Line fleet, costing in excess of $450 million dollars, on January 13, 2012 at approximately 7 p.m. local time, departed out of the Port of Civitavecchia, Italy (in the Tyrrhenia Sea), carrying approximately 4,200 passengers and heading north to Savona.  On information and belief, the *Costa Concordia* is owned and operated by one

or more of Defendants directly and/or through one of their subsidiaries or agents.  The *Costa Concordia* is variously referred to throughout this complaint as the "ship" or the "vessel."

17.     On information and belief, the *Costa Concordia* was to embark on its regular itinerary schedule that included stops in ports at Savona, Italy; Marseille, France; Barcelona, Spain; Palma de Mallorca, Spain; Cagliari, Italy; and Palermo, Italy.

18.     On information and belief, the *Costa Concordia*'s normal course took it through the middle of the channel between Giglio Island and the mainland.  However, the captain of the ship, Francesco Schettino, was determined to perform a "sail-by-salute" for Giglio Island.  On information and belief, Defendants knew the *Costa Concordia* had sailed close to the shoreline on previous occasions to engage in the "sail-by-salute" practice.  On information and belief, Defendants also knew that a sail-by-salute was planned to take place for the *Costa Concordia* on that day.  Indeed, Schettino told Italian prosecutors, "[i]t was planned, we were supposed to have done it a week earlier but it was not possible because of bad weather."  On information and belief, the sail-by-salute was a practice actively encouraged by Defendants for marketing and promotional purposes.  Schettino told prosecutors, "They insisted.  They said:  'We do tourist navigation, we have to be seen, get publicity and greet the island.'"

19.     On information and belief, Defendants have previously given Captain Schettino permission to skirt the coast of Giglio Island to engage in the sail-by-salute practice.  For example, on information and belief, on August 14, 2011, with Costa Crociere's approval, Captain Schettino performed the maneuver in daylight during an island festival in Giglio Island.

20.     On information and belief, as the *Costa Concordia* got closer to Giglio Island, Captain Schettino's plan was to take the ship off course and steer the ship starboard to take the ship parallel to the coastline.  On information and belief, however, as the ship made its approach, Captain Schettino was distracted by, among other things, talking on the telephone with his old mentor.  In addition, on information and belief, the ship was travelling at an unsafe speed for being so close to shore.  Moreover, on information and belief, instead of relying on radar and maps, Captain Schettino relied primarily on his own eyesight to perform the maneuver.

21.     On information and belief, as the ship closed in on Giglio Island, the Captain and officers in the bridge failed to notice a fast approaching rock formation.  On information and belief, despite purported attempts to steer hard starboard away from the rock, it was too late.  The ship's bow and midsection cleared the rock, but the stern swung toward the island, striking the submerged part of the rock.  On information and belief, at approximately 9:44 p.m., four (4) miles off the intended course in pursuit of his sail-by-salute of Giglio Island, the ship hit the rock, scraping it, and tearing an approximate 230 foot-long horizontal gash in the hull on the port side of the ship.  The ship began taking in water.

22.     On information and belief, passengers described feeling shaken as if in an earthquake, hearing a loud rumbling noise, and then feeling the ship listing violently to the port side, but no alarm sounded.

23.     On information and belief, shortly thereafter the power on the ship went out; despite the knowledge of the ship's captain and officers in the bridge that the ship had collided with the reef and suffered a massive breach, announcements were made over the loudspeakers stating that it was an electrical blackout, the technicians were working on it, and it would be fixed soon.

24.     On information and belief, approximately fifteen (15) minutes after the collision Captain Schettino called the ship's owners, the Defendants, to advise them of the situation.  The Italian Coast Guard was not called by either the captain or the ship's owners, and no SOS was ever issued.

25.     On information and belief, in the meantime, the nearest land was behind the now powerless ship which was adrift at sea.  On information and belief, with the help of the prevailing wind and current, the ship managed to complete a hairpin turn to starboard to turn the ship completely around to drift toward rocks near the island.

26.     On information and belief, at the time the passengers were being told to return to their cabins, Captain Schettino, the officers, and the ship's owners were aware the ship was sinking and the captain was trying to use the docking thrusters to beach the ship.

27.     On information and belief, the Italian Coast Guard received numerous phone calls from passengers and emergency operators which prompted it to make contact with the ship.

28.     On information and belief, at approximately 10:26 p.m., Captain Schettino, responding to an Italian Coast Guard official, admitted damage to the ship but said a tugboat was all that was needed.

29.     On information and belief, continuing to head north, the *Costa Concordia* was steered to Giglio Island and next hit the reef at Gabbinara point.  The front of the ship swung around and became pinned by the rocks at approximately 10:50 p.m.

30.     On information and belief, Captain Schettino gave the order to abandon ship at approximately 11:00 p.m., and abandoned ship himself shortly thereafter and prior to evacuation of all passengers.  The passengers were left to fend for themselves.

31.     On information and belief, the ship continued to list to its starboard side.  On information and belief, over the next several hours, through only the efforts of the Italian Coast Guard, local resident volunteers, and emergency response and rescue workers, passengers were slowly evacuated from the ship under the most harrowing and frightening of circumstances.

32.     On information and belief, most of the officers and crew members, on the other hand, were of little help.  On information and belief, a large portion of crew members did not know how to operate safety and evacuation equipment; a large portion of the crew did not speak Italian, French, German, Spanish, or English to a degree where they could communicate with the passengers or other crew members; there were not enough life vests and many of the night lights in the life vests were not working; and many crew members did not know how to properly operate and lower life boats.

33.     On information and belief, most of the life boats on one side of the ship were underwater and/or unreachable by the time the captain gave the order to evacuate.  Consequently, there were not enough life boats and many passengers, including passengers who did not know how to swim, were forced to climb down the ship and dive into the cold winter-time sea.

34.     On information and belief, the passengers who swam or were dragged to shore arrived at the shore to find the captain, his companion, and many senior officers on shore, dry, and with their luggage.

35.     On information and belief, at 12:42 a.m., while passengers were still swimming to shore, the Coast Guard commander contacted the captain.  The captain was ordered to return to the ship and to climb aboard to inform the Coast Guard how many people were still on board. Despite being told that there were women and children still stranded, the captain never returned to the ship.

36.     On information and belief, to date, the catastrophe caused, along with the deaths of thirty two (32) people, the irreversible damage of thousands of feet of sea bed, the chemical and petrochemical contamination of millions of gallons of sea water, as well as a yet incalculable damage to the delicate ecosystem of the island and the surrounding waters.

37.     At the time of filing the present complaint, the 951 foot ship remains aground lying at an angle of 80 degrees on the Gabbinara reef, just outside the entrance to Giglio Harbor. It is a vivid eyesore for nearby residents, an impediment to visitors and tourists, and the death sentence of the most prominent diving reef on the island.


**B.     Impact of Disaster on Giglio Island Tourism and Environment**

38.     Giglio Island, or *Isola del Giglio* in Italian, is an island situated in the Tyrrhenian Sea off the coast of Tuscany.  The island's leading industry is tourism and tourism related services.  Among other things, the island's beaches attract tens of thousands of tourists every summer.  It also a very popular boating and scuba diving destination. Italy's Legambiente announced in 2009 that the Tuscan Archipelago's Isola del Giglio was ranked as the Number 1 coastal destination in the country that year, due "not only to its pristine waters, gorgeous scenery, and picture-perfect beaches, but also because of its art, food, and respect for the environment." (http://www.italybeyondtheobvious.com/2009/05/diving-in-italy-part-ii-the-tuscan-archipelago.html) Giglio Island lies within the Pelagos Sanctuary for Mediterranean Marine

Mammals, one of the Specially Protected Areas of Mediterranean Importance.  The waters off its coastline of Giglio Island are home to diverse plant and marine life, including whales, porpoises, dolphins, sharks, tuna, and brill fish.

39.     However, as a result of the *Costa Concordia* disaster caused by Defendants as alleged and described above, tourism has suffered a sharp decline in Giglio Island.  The haunting image of the gigantic shipwreck dominates every angle on the small island.  From the outset of the disaster, tourists have been, and continue to be, deterred by, among other things, the presence and eyesore of the wreck; the stigma associated with the ship's presence due to the gruesome nature of the catastrophe and the fatalities suffered; the threat of pollution and contamination of the sea from leaking fuel, acetylene, grease, paint, sodium hypochlorite, insecticide, and other chemical and petrochemical pollutants causing water quality and toxicity issues and threatening marine life; the release of endless debris from the ship, such as deck furniture, mattresses, garbage, and other items; the flood of emergency workers and officials, ongoing investigation, salvage and cleanup operations; and other factors.

40.     On information and belief, two months following the catastrophe, Greenpeace's Italian subchapter commissioned the independent lab Eurofins Programma Ambientale di Padova, to preliminarily evaluate the waters around Giglio island.  On information and belief, the results of these analyses indicate the waters surrounding the island contain larger quantities of Ammonia Nitrogen (ranging from 2.04 micrograms (mg) to 2.12 mg per liter (l) of seawater while the limit is greater than 0.066 mg / l) and Surfactants (chemicals that reduce surface tension in water and other liquids, the most familiar use of which is soaps, laundry detergents, dishwashing liquids, shampoos and lubricants - in quantities ranging from 3.77 mg / l to 4.35 mg / l while the maximum allowed by law is 0.50 mg / l).  Additionally, on information and belief, the research also showed the presence of hydrocarbons in drinking water on the island (on information and belief 82 mg / l).  On information and belief this conclusively indicates that the chemical and petrochemical contamination of the waters is already in effect.

41.     In addition, on information and belief, operations to remove the ship from Giglio Island coastline along with related construction, reclamation, restoration, and environmental remediation work has not yet commenced, and, on information and belief, will not be completed for months or possibly years, during which time, tourism will continue to suffer.

42.     Plaintiffs and those similarly situated businesses that are dependent on tourism or natural resources, have suffered, continue to suffer, and will endure more financial losses as a result of the *Costa Concordia* disaster.  Notably, the threat, stigma and the actual environmental contamination will not disappear once the salvage operations are concluded.   The financial shortcomings that Plaintiffs and those similarly situated have experienced so far as a result of the *Costa Concordia* disaster may cause an insurmountable obstacle that will prompt the closure of many businesses.


C.      **Impact of Disaster on Giglio Island Property Owners**

43.     In 2005, prior to the accident of the *Costa Concordia*, Travel + Leisure, a popular travel U.S. magazine, said this of Giglio island: "Giglio was something else: an easily accessible aquatic paradise with some trappings of civilization.   We vowed to return soon…." (http://www.travelandleisure.com/articles/italys-undiscovered-islands)

44.     On information and belief, for the last several decades property values on the island were consistent with the notion that Giglio Island was a small, comfortable aquatic paradise and, given the limited availability of property and low inventory of property for sale, the same were good values.

45.     As a direct result of Defendants' acts and omissions, which lead to damages to the ecosystem and economy of the island, the property values have declined.

46.     The reputation of the island has also affected property values. In comparison with the Travel + Leisure article of 2005, and the thousands like it, today, a quick search of "Giglio Island" on Google returns tens of thousands of articles directly tied to the *Concordia* Catastrophe as well as the numerous deaths that occurred as a result of the same.

47.     Property values will likely remain low as the stigma of the numerous deaths that occurred on the eve of the accident, as well as the release of debris, chemicals, and petrochemicals tied with the catastrophe depresses the economy of the island and the island's tourism for years to come.

### D.     Relationship of Costa to Carnival

48.     Carnival is the largest and financially strongest cruise company in the world, and among the largest and most profitable vacation companies in the world.

49.     Carnival has a portfolio of widely recognized cruise brands that are sold in all major vacation markets of the world and is a leading provider of cruises to all major vacation destinations.

50.     Carnival's brands include Costa Cruises, which calls on 250 ports around the world.

51.     On information and belief, Carnival directly and/or through its agents undertakes to train and supervise the crew, including officers, in ship navigation, maneuvering, operation, and safety, bridge resource management, ship stability, emergency preparedness and other maritime skills for all of its cruise brands, including Costa Cruises.

52.     Carnival, together with Carnival plc exercise such a degree of control over Costa Cruise Lines that the acts of Costa Cruise Lines are in fact the acts of Carnival and Carnival plc. Costa Cruise Lines acts as an agent of and manifests no separate corporate interests of its own and functions solely to achieve the purposes of Carnival and Carnival plc.

53.     Costa Cruise Lines is the alter-ego of Carnival and Carnival plc.  Among other things, on information and belief, they share an interlocking board of directors.  On information and belief, for example, Pier Luigi Foschi is a director of Carnival plc and chairman of Costa Cruise Lines.  On information and belief, they share the same audit committee, compensation committee, executive committee, and health, environmental, safety & security committee, and each promulgates policies and procedures that are applied to all the cruise line brands.

54.     As acknowledged by Carnival plc in a press release dated January 19, 2012 regarding the *Costa Concordia* disaster, Defendants also share the same maritime policy and compliance officer.  The press release stated, in part:

> Carnival Corporation & plc and the cruise industry as a whole have maintained an excellent safety record over the years.  "However, this tragedy has called into question our company's safety and emergency response procedures and practices," said Micky Arison, chairman and CEO of Carnival Corporation & plc.  "While I have every confidence in the safety of our vessels and the professionalism of our crews, this review will evaluate all practices and procedures to make sure that this kind of accident doesn't happen again."  The review is being led by captain James Hunn, a retired U.S. Navy captain and currently the company's senior vice president of Maritime Policy & Compliance.  Following a 32-year career in the Navy, Hunn has held senior positions at Carnival Corporation & plc for nearly a decade, focusing on corporate-wide efforts to establish maritime policy standards, while overseeing the company's health, environmental safety, and security practices.

55.     Furthermore, Defendants are responsible for training across the cruise brands. Carnival plc owns CSMART, a state of the art training facility which trains Costa Cruise Lines employees, as stated on its website www.csmartalmere.com, where the facility is described as:

> CSMART, the Center for Simulator Maritime Training, is a maritime training facility located in Almere, Netherlands.  CSMART is a service mark of Carnival plc.  CSMART operates as the Dutch branch of Carnival plc, which is part of the Carnival Corporation & plc group.  CSMART features the latest state of the art equipment and instructional tools to provide participants with a superior maritime training experience that will foster critical thinking, problem solving, ethical decision making, and confidence.  CSMART offers two full mission bridge simulators, six part-task simulators.

56.     Furthermore, the financial losses associated with the *Costa Concordia* disaster are reported as losses of *Carnival* and of *Carnival plc* on their form 10-Q for the period ending February 29, 2012.  As stated therein:

> During the three months ended February 29, 2012, *we* wrote-off the net carrying value of *Costa Concordia* in the amount of $515 million and recorded a short-term insurance recoverable for the same amount since the ship was deemed to be a constructive total loss. . . . In addition, during the three months ended February 29, 2012, we recognized $29 million for *Costa Concordia* incident related expenses that are not covered by insurance, including a $10 million

insurance deductible relating to third party personal injury liabilities, which are principally included in other ship operating expenses.

As a result of the *Costa Concordia* accident, litigation claims, enforcement actions, regulatory actions and investigations, including, but not limited to, those arising from . . . business interruption losses or environmental damage to any affected coastal waters and the surrounding areas, have been and may be asserted or brought against various parties *including us*.

57.     In another area of the form 10-Q, Carnival and Carnival plc, referring to the *Costa Concordia* disaster, state "*[o]ur* expectations for 2012 are affected by the direct and indirect financial consequences of the *Costa Concordia* accident. . . . We believe the accident will not have a significant long-term impact on *our business.*"

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action on their own behalf, and as a class action on behalf of the Class defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3).  The Class consists of fishermen, property owners, business owners, and wage earners on Giglio Island who have suffered damages arising out of the *Costa Concordia* disaster.  Specifically, Plaintiffs bring this suit on behalf of the following Class:

All fishermen, property owners, business owners, and wage earners on Giglio Island in Italy, as well as those working in and around the island from surrounding territories, who claim injury and/or damages as a result of the January 13, 2012 crash and shipwreck of the *Costa Concordia*.  The Class excludes:  (a) the officers and directors of any of Defendants; (b) any judge or judicial officer assigned to this matter, the members of his or her immediate family, and members of his or her judicial staff; (c) any individual who has claims for personal physical and/or bodily injury as a result of the *Costa Concordia* catastrophe that is the subject of this action; (d) any legal representative, successor, or assign of any

excluded persons or entities; (e) counsel representing the Class and all persons employed by said counsel; (f) governmental entities; and (g) any individual whose interests are antagonistic to other Class Members;

59.     Defendants subjected Plaintiffs and the Class to the same negligent acts and omissions, and harmed them in the same manner.  Now, Plaintiffs and the Class seek to enforce the same rights and remedies pursuant to the same legal theories:  (A) negligence, (B) gross negligence, and (C) nuisance.

60.     Numerosity:  The members of the Class are so numerous that individual joinder of all members is impracticable.  While the exact number and identities of the Class Members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.  Plaintiffs are informed and believe and therefore allege that there are more than one thousand (1,000) members of the Class.  The disposition of the claims of these Class Members in a single class action will provide substantial benefits to all parties and to the Court.

61.     Typicality:  Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all Class Members have sustained damages arising out of Defendants' common course of conduct as complained of herein.  The damages sustained by each member of the Class were caused directly by Defendants' wrongful conduct, as alleged herein.  Each of the Class Members asserts the same legal causes of action.

62.     Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have no interests adverse or antagonistic to the Class.  Plaintiffs have retained attorneys who are experienced in the handling of complex litigation, class actions, and international litigation, and Plaintiffs intend to prosecute this action vigorously.  Moreover, Plaintiffs have retained U.S. counsel that is a native of Italy, fluent in Italian and maintains experience in litigation with foreign citizens.

63.     Superiority of Class Action and Impracticability of Individual Actions:  A class action is superior to other available methods for the fair and efficient adjudication of this

controversy because individual litigation of the claims of all Class Members is impracticable. Requiring each individual Class Member to file an individual lawsuit would unreasonably consume the amounts that may be recovered. Also, Class Members may be reticent to file individual actions against Defendants out of fear of retaliation. Even if every Class Member could afford individual litigation, the adjudication of more than one thousand identical claims would be unduly burdensome to the courts. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the conduct of this action as a class action, with respect to some or all of the issues presented herein, presents no management difficulties, conserves the resources of the parties and of the court system, and protects the rights of the Class Members. Plaintiffs anticipate no difficulty in the management of this action as a class action. The prosecution of separate actions by individual Class Members may create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class Members not parties to such adjudications or that would substantially impair or impede the ability of such non-party Class Members to protect their interests.

64. <u>Common Questions of Law and Fact Predominate</u>: Common questions of fact and law exist as to all Class Members that predominate over any questions affecting only individual Class Members. These common legal and factual questions, which do not vary among Class Members, and which may be determined without reference to the individual circumstances of any Class member include, but are not limited to, the following:

(a)     Whether Defendants' acts and omissions, as alleged herein, were negligent;

(b)     Whether Defendants' acts and omissions, as alleged herein, were grossly negligent;

(c)     Whether Defendants' acts and omissions, as alleged herein, resulted in a nuisance;

(d)     Whether Defendants' acts and omissions, as alleged herein, caused harm to Plaintiffs and the Class;

(e)      Whether Plaintiffs' and the members of the Class suffered damages;

(f)      Whether Defendants' acts and omissions, as alleged herein, subjects them to punitive damages.

65.      <u>Notice</u>.  Notice can be provided via Internet publication, published notice, and/or through mail and paid for by Defendants.

## **COUNT I:  NEGLIGENCE**

### **(By all Plaintiffs Against all Defendants)**

66.  Plaintiffs repeat the allegations set forth in all paragraphs above as though fully set forth herein.

67.      At all material times hereto, Defendants owned, operated, managed, maintained and/or controlled the vessel, *Costa Concordia*, and had exclusive custody and control of the vessel while navigating the vessel through the waters off the coast of Giglio Island in or near areas where Plaintiffs and the putative class members operate and maintain their businesses, and own property.  Therefore, Defendants owed to Plaintiffs and the putative class members a duty to exercise due care in their operation and navigation of the vessel, which included, without limitation, the duty to avoid colliding or scraping with reefs, rocks, and other objects, to avoid navigating too close to the shore of Giglio Island, following all company and internal rules, policies, procedures, and best practices for the safe operation and navigation of a large cruise ship, following all International, United States, and industry rules, laws, regulations, norms, protocols, standards, and best practices for the safe operation and navigation of a large cruise ship, staying on the planned and normal course of the planned itinerary for the cruise, making use of available radar, maps, GPS, and other technology or guidance materials available in the operation and navigation of the vessel, and avoiding activities with the potential to impact the ability for the operators and navigators of the vessel from remaining alert and attentive.

68.      Defendants breached their duty, and were negligent, by failing to use reasonable care in at least the following respects:

(a)     Taking the ship off its planned and normal course and sailing a ten-story cruise ship close to a coastal reef;

(b)     Taking the ship off its planned and normal course to navigate the ship dangerously close to the shoreline of Giglio Island to conduct a "sail-by-salute";

(c)     Causing the vessel to scrape against and collide with a large rock at sea creating an approximate 230 foot gash in the hull on the port side of the vessel and leading to the vessel being run aground on rocks at an 80 degree angle on its side near the entrance of the Giglio Island Harbor, where it remains today;

(d)     Operating the ship at dangerous speeds so close to the shore of Giglio Island;

(e)     Operating and navigating the ship so close to the shore of Giglio Island without the use of radar, maps, GPS, or other available technology or guidance materials, and instead, relying solely on eyesight;

(f)     Operating and navigating the ship so close to the shore of Giglio Island in a distracted state from talking on the phone;

(g)     Allowing and/or encouraging the practice of sail-by-salutes on the *Costa Concordia* and on other vessels owned, managed, and operated by Defendants;

(h)     Knowing that Captain Schettino had previously engaged in the practice of sail-by-salutes on the *Costa Concordia* and other vessels, and allowing him and/or encouraging him to continue to engage in the same practice with the *Costa Concordia* on January 13, 2012;

(i)     Failing to promulgate, implement, and enforce a policy prohibiting the "sail-by-salute" practice, and to train captains and officers on the dangers of such practices.

(j)     Failing to review, analyze, and/or remain attentive to the navigational charts for the planned course the vessel would take, including, without limitation, any potential reefs, nature preserves, sand bars or other potential undersea hazards that may be within close vicinity of the planned course;

(k)     Vesting excessive discretion in Defendants' captains, officers, and crew members to, among other things, sail vessels off course even in cases where there is no emergency, bad weather, or other circumstances of necessity, to engage in "sail-by-salutes," and override automated alerts, alarms, sensors, guidance, and other systems on the vessels without valid justification.

(l)     Failing to observe, follow, and/or comply with internal rules, policies, procedures and best practices for the safe operation and navigation of the vessel;

(m)    Failing to observe, follow, and/or comply with International, United States, and industry rules, laws, regulations, norms, protocols, standards and best practices for the safe operation and navigation of the vessel.

(n)     Failing to promulgate, implement, and enforce policies, procedures, and guidance pertaining to the safe operation of the *Costa Concordia* which, if they had been so promulgated, implemented, and enforced, would have averted the grounding and sinking of the vessel;

(o)     Failing to provide adequate training to captains, officers, and crew members in the safe operation and navigation of a vessel.

(p)     Retaining Captain Schettino to be the captain of *Costa Concordia* given his insufficient and inadequate experience, poor safety record, a reputation for being irresponsible and careless, and other lack of qualifications.

(q)     Failing to properly inspect and failing to conduct safety training and drills on the *Costa Concordia*; and

(r)     Engaging in such other acts of negligence and omissions as will be shown at the trial of this matter.

69.    Defendants knew, should have known, or could reasonably have foreseen that their wrongful acts and omissions would injure Plaintiffs and the putative class members. Defendants' acts and omissions were negligent and were a proximate cause of the damages and injuries sustained by Plaintiffs and the putative class members.

70.     As a direct and proximate result of the negligence of Defendants, Plaintiffs and the putative class members have sustained substantial damages in a total amount exceeding $75,000,000 (Seventy Five Million Dollars), to be determined according to proof at trial.

## COUNT II:  GROSS NEGLIGENCE

### (By all Plaintiffs Against all Defendants)

71.     Plaintiffs repeat the allegations set forth in all paragraphs above as though fully set forth herein.

72.     At all material times hereto, Defendants owned, operated, managed, maintained and/or controlled the vessel, *Costa Concordia*, and had exclusive custody and control of the vessel while navigating the vessel through the waters off the coast of Giglio Island in or near areas where Plaintiffs and the putative class members operate and maintain their businesses, and own property.  Therefore, Defendants owed to Plaintiffs and the putative class members a duty to exercise due care in their operation and navigation of the vessel, which included, without limitation, the duty to avoid colliding or scraping with reefs, rocks, and other objects, to avoid navigating too close to the shore of Giglio Island, following all company and internal rules, policies, procedures, and best practices for the safe operation and navigation of a large cruise ship, following all International, United States, and industry rules, laws, regulations, norms, protocols, standards, and best practices for the safe operation and navigation of a large cruise ship, staying on the planned and normal course of the planned itinerary for the cruise, making use of available radar, maps, GPS, and other technology or guidance materials available in the operation and navigation of the vessel, and avoiding activities with the potential to impact the ability for the operators and navigators of the vessel from remaining alert and attentive.

73.     Defendants breached their duty, and were grossly negligent in that they were so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of Plaintiffs and the putative class members.   More specifically, Defendants were grossly negligent in at least the following respects:

(a)     Taking the ship off its planned and normal course to navigate the ship dangerously close to the shoreline of Giglio Island to conduct a "sail-by-salute";

(b)     Causing the vessel to scrape against and collide with a large rock at sea creating an approximate 230 foot gash in the hull on the port side of the vessel and leading to the vessel being run aground on rocks at an 80 degree angle on its side near the entrance of the Giglio Island Harbor, where it remains today;

(c)     Operating the ship at dangerous speeds so close to the shore of Giglio Island;

(d)     Operating and navigating the ship so close to the shore of Giglio Island without the use of radar, maps, GPS, or other available technology or guidance materials, and instead, relying solely on eyesight;

(e)     Operating and navigating the ship so close to the shore of Giglio Island in a distracted state from talking on the phone;

(f)     Allowing and/or encouraging the practice of sail-by-salutes on the *Costa Concordia* and on other vessels owned, managed, and operated by Defendants;

(g)     Knowing that Captain Schettino had previously engaged in the practice of sail-by-salutes on the *Costa Concordia* and other vessels, and allowing him and/or encouraging him to continue to engage in the same practice with the *Costa Concordia* on January 13, 2012;

(h)     Failing to promulgate, implement, and enforce a policy prohibiting the "sail-by-salute" practice, and to train captains and officers on the dangers of such practices.

(i)     Failing to review, analyze, and/or remain attentive to the navigational charts for the planned course the vessel would take, including, without limitation, any potential reefs, nature preserves, sand bars or other potential undersea hazards that may be within close vicinity of the planned course; and

(j)     Engaging in such other acts of negligence and omissions as will be shown at the trial of this matter.

74.     Defendants knew, should have known, or could reasonably have foreseen that their wrongful acts and omissions would injure Plaintiffs and the putative class members. Defendants' acts and omissions were grossly negligent and were a proximate cause of the damages and injuries sustained by Plaintiffs and the putative class members.

75.     As a direct and proximate result of the gross negligence of Defendants, Plaintiffs and the putative class members have sustained substantial damages in a total amount exceeding $75,000,000 (Seventy Five Million Dollars), to be determined according to proof at trial.

76.     Defendants' gross negligence was a substantial cause of Plaintiffs' and the putative class members' damages.  Therefore, Plaintiffs and the putative class members are entitled to an award of exemplary or punitive damages.

### COUNT III:  NUISANCE

**(By all Plaintiffs Against all Defendants)**

77.     Plaintiffs repeat the allegations set forth in all paragraphs above as though fully set forth herein.

78.     Defendants carried out, and/or substantially participated in the following activities:

(a)     Taking the *Costa Concordia* off its planned and normal course and sailing the ten-story cruise ship dangerously close to a coastal reef and close to the shoreline of Giglio Island to conduct a "sail-by-salute";

(b)     Causing the vessel to scrape against and collide with a large rock at sea creating an approximate 230 foot gash in the hull on the port side of the vessel;

(c)     Running the vessel aground on rocks at an 80 degree angle on its side near the entrance of the Giglio Island Harbor, where it remains today; and

(d)     Engaging in the above-described activities in a negligent, grossly negligent, and/or reckless manner.

79.     Defendants carried out, and/or substantially participated in the above-described activities in such a way as to seriously interfere with Plaintiffs' and the putative class members' free use and enjoyment of their property interests.   More specifically, the above-described activities have caused the sunken, capsized, and shipwrecked 951-foot *Costa Concordia* to remain present as an eyesore and source of environmental contamination and debris off the coast of Giglio Island.  The ship's continued presence and its release of environmental contamination has interfered with Plaintiffs' and the putative class members' free use, possession, and/or enjoyment of their property by significantly reducing property values, reducing tourism in Giglio Island in general, and specifically deterring tourists from purchasing goods and services from Plaintiffs.

80.     As a direct and proximate result of the nuisance caused by Defendants, Plaintiffs have sustained substantial damages in a total amount exceeding $75,000,000 (Seventy Five Million Dollars), to be determined according to proof at trial.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the proposed Class and/or others similarly situated, pray for judgment and the following specific relief against Defendants:

1.      Certification of this case as a Class Action on behalf of the proposed Class;

2.      Designation of Plaintiffs Giglio Sub, by and through its representative Adamo Mattera, and Francesco Onida, as representatives of the Class;

3.      An injunction and order that Defendants adopt a policy to maintain minimum safety distances from Giglio Island for all future travel;

4.      An award of actual damages sustained in a total amount exceeding $75,000,000 (Seventy Five Million Dollars) to be determined according to proof at trial;

5.      An award of punitive damages;

6.      An award of pre-judgment and post-judgment interest, as well as reasonable attorneys' and experts' fees and other costs; and

7.     An award of such other and further equitable and legal relief as this Court may deem appropriate including relief available under all applicable state laws.


Respectfully submitted,

Date:  May 3, 2012                              EDWARD M. RICCI, P.A.


By:    /s/Edward M. Ricci
       EDWARD M. RICCI, ESQ.
       Florida Bar No. 185673
       Edward Ricci, P.A.
       303 Banyan Blvd., Suite 400
       West Palm Beach, FL 33401
       edricci@edriccilaw.com
       Work  (561) 842-2820
       Fax  561-844-6929


## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all causes/counts so triable.


Respectfully submitted,

Dated:  May 3, 2012                             EDWARD M. RICCI, P.A.


By:    /s/Edward M. Ricci
       EDWARD M. RICCI, ESQ.
       Florida Bar No. 185673
       Edward Ricci, P.A.
       303 Banyan Blvd., Suite 400
       West Palm Beach, FL 33401
       edricci@edriccilaw.com
       Work  (561) 842-2820
       Fax  561-844-6929