**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 12-21680-CIV-ROSENBAUM/SELTZER**

GIGLIO SUB s.n.c, an Italian General Partnership,
and FRANCESCO ONIDA, an individual,

      Plaintiffs,

vs.

CARNIVAL CORPORATION, a Florida Foreign
Corporation, a/k/a Carnival Cruise Lines,
CARNIVAL PLC, COSTA CRUISE LINES, INC.,
a Florida Corporation, COSTA CROCIERE S.P.A.
COMPANY, JOHN DOES, JOHN DOES, INC.,

      Defendants.

_____/

## ORDER DISMISSING COMPLAINT ON *FORUM NON CONVENIENS* GROUNDS

      This matter is before the Court upon Defendants' Motion to Dismiss Based on the *Forum Non Conveniens* Doctrine [D.E. 16].  The Court has carefully reviewed all supporting and opposing filings and the case file and is fully advised in the premises.  For the reasons set forth below, the Court now grants Defendants' Motion to Dismiss Based on the *Forum Non Conveniens* Doctrine.

### *I.  Background*

      This case arises out of the tragic shipwreck of the cruise ship *Costa Concordia* on January 13, 2012.  Because the details of the accident are not material to the resolution of the pending motion, they will not be recounted here, except to note that the ship traveled under an Italian flag, boasted an Italian crew, and wrecked in Italian waters just off of the Italian Island of Giglio.[1]

---

[1]The details are also widely available in the media.  *See, e.g.*, Michael Agar & Andrew Blenkinsop, *Concordia: How the Disaster Unfolded*, Telegraph (U.K.), Jan. 16, 2012, http://www.telegraph.co.uk/news/interactive-graphics/9018076/Concordia-How-the-disaster-unf

Plaintiffs Giglio Sub, an Italian corporation, and Francesco Onida, an Italian citizen, ("representative Plaintiffs") are residents of Giglio Island. D.E. 1 at 2. They filed this suit on May 3, 2012, as a class action on behalf of a putative class of more than 1,000 "fishermen, property owners, business owners, and wage earners on Giglio Island, as well as those working in and around the island" who claim damages to their businesses stemming from the wreck of the *Costa Concordia*. D.E. 1 at 13-14. Like the crew of the *Costa Concordia*, most, if not all, of Plaintiffs are Italian. Plaintiffs allege causes of action for negligence, gross negligence, and nuisance, and seek $75 million in economic damages, plus punitive damages. D.E. 1 at 22. In addition, notably, Plaintiffs ask this United States Court to issue an injunction requiring Defendants to adopt a policy to maintain a safe distance from Italy's Giglio Island in all future travel. D.E. 1 at 22.

Defendants are four closely related, but distinct, corporations involved in the cruise industry. They include Carnival Corporation ("Carnival"), a Panamanian corporation with its principal place of business in Miami, Florida; Carnival plc, an English and Welsh corporation with its principal place of business in London, England; Costa Crociere S.p.A. ("Costa"), an Italian company with its principal place of business in Genoa, Italy; and Costa Cruise Lines, Inc. ("CCL"), an independent marketing subsidiary of Costa, incorporated in Florida with its principal place of business in Florida. D.E. 16 at 12-14.

Plaintiffs contend that the *Costa Concordia* is directly owned and managed by one or more

___

olded.html (last visited September 18, 2012); Bryan Burrough, Another Night to Remember, Vanity Fair, May 2012, http://www.vanityfair.com/culture/2012/05/costa-concordia-sinking-scandal-italy (last visited September 18, 2012).

Defendants whose negligence caused the disaster. D.E. 1 at 4-5.  Among the negligent acts for which Plaintiffs blame Defendants are a failure to develop, adopt, implement, and monitor policies that would have prevented the disaster.  D.E. 1 ¶ 68(i), (n).  Additionally, Plaintiffs allege, among other things, that the *Costa Concordia* was operated at dangerous speeds, navigated without the use of navigational aids or charts, and permitted to be taken off course to perform a "sail-by-salute," all by its Italian crew.  Plaintiffs further assert that Defendants failed to properly train the crew, conduct safety drills, and inspect the vessel. D.E. 1 ¶ 68(d), (e), (f), (j), (o), (q).

In response to the filing of the lawsuit, Defendants filed their Motion to Dismiss Based on the *Forum Non Conveniens* Doctrine.  D.E. 16.  The Motion has been fully briefed and is ripe for disposition.

## *II. Plaintiffs' "Request" to Strike Declarations*[2]

### A. Substantive Declarations and Evidence Submitted with Defendants' Reply Brief

After Defendants filed their Reply in Support of their Motion to Dismiss [D.E. 61], Plaintiffs filed a "Request" [D.E. 65] to strike the declarations and exhibits attached to the Reply on the grounds that the attachments represented "new evidence improperly submitted on reply."  D.E. 65 at 1.  In particular, Plaintiffs seek to strike the second declaration of Bruno Cavallone [D.E. 62-1] because it raises topics that "should have been addressed by Mr. Cavallone in his initial declaration."

---

[2]Plaintiffs' Request to Strike attacks substantive evidence submitted by Defendants with their Reply brief and three declarations seeking to cure defects in prior declarations submitted by Defendants.  D.E. 65 at 3.  The declarations were originally attacked by Plaintiffs in an independent motion [D.E. 58-32], which was briefed separately by Defendants [D.E. 62-7].  Because the declarations regard factual matters relating to the Motion to Dismiss Based on the *Forum Non Conveniens* Doctrine, the Court first rules on their admissibility.

D.E. 65 at 2.  Plaintiffs also move to strike the declaration of Marco Lopez de Conzalo [D.E. 62-2] because they were previously unaware that Mr. Lopez de Gonzalo would be providing information in this matter. D.E. 65 at 2.  Finally, Plaintiffs seek to exclude Costa Crociere S.P.A.'s Second Amended Objections and Answers to Plaintiffs' First Set of Interrogatories [D.E. 62-6] because Defendants "obviously kn[ew]" the information contained within those discovery responses when they filed their Motion to Dismiss.  D.E. 65 at 2-3.  Alternatively, Plaintiffs ask the Court for leave to file a sur-reply with new evidence of their own purporting to refute the evidence in Defendants' attachments to their Reply.  D.E. 65 at 3.

As Plaintiffs point out, in this Court, "reply memorandum shall be strictly limited to rebuttal of matters raised in the memorandum in opposition."  S.D. Fla. L.R. 7.1(c).  Generally, if a reply brief raises arguments or factual matters that do not rebut those contained in an opposition brief, a court will not consider them. *See, e.g.*, *Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012). *But see ABCO Premium Fin. LLC v. Am. Int'l Group, Inc.*, No. 11-23020-CIV, 2012 WL 3278628, at *4 (S.D. Fla. Aug. 9, 2012) ("While the 'raising of new issues and submission of new facts in a reply brief is improper,' a court has the discretion to consider the additional exhibits despite this procedural shortcoming.") (quoting *Fisher v. Ciba Specialty Chem. Corp.*, 238 F.R.D. 273, 311 n.82 (S.D. Ala. 2006)).  Bringing up new facts in a reply brief is also improper if no good reason exists for why the party could not have introduced the facts in its original motion.  *See Gold v. Wolpert*, 876 F.2d 1327, 1331 n.6 (7th Cir. 1989); *TCC Air Servs., Inc. v. Schlesinger*, No. 05-80543-CIV, 2009 WL 56516, at *7 (S.D. Fla. Mar. 5, 2009) (rejecting reply evidence that was available to plaintiffs when they filed their principal motion and plaintiffs understood the necessity

of submitting such evidence).

A significant difference exists, however, between new arguments and evidence, on the one hand, and rebuttal arguments and evidence, on the other.  Whereas raising new arguments or factual matters is "improper" on reply, under Local Rule 7.1(c), S.D. Fla., "the movant may serve a reply memorandum with affidavits, declarations, or other materials, provided that all such materials are strictly limited to rebuttal of matters raised in the opposing memorandum."  *See also Morrison v. Quality Transps. Servs.*, Inc., 474 F. Supp. 2d 1303, 1313-14 (S.D. Fla. 2007).  Thus, reply affidavits and declarations may contain facts not previously mentioned in the opening brief, as long as the facts rebut elements of the opposition memorandum and do not raise wholly new factual issues.  *See Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1280-81 (S.D. Fla. 2002) (finding a party's use of a new declaration appropriately rebutted the other party's arguments).

In *Del Istmo Assurance Corp. v. Platon*, No. 11-61599-CIV, 2011 WL 5508641 (S.D. Fla. Nov. 9, 2011), for example, a case similarly presenting this issue in the context of a *forum non conveniens* motion, the court declined to permit the moving party to file supplemental affidavits in support if its motion to dismiss on *forum non conveniens* grounds.  Later, the moving party filed the very same previously-rejected affidavits in support of its reply brief.  When the opposing party sought to strike them, the court found that the supplemental affidavits constituted rebuttal evidence and denied the motion, citing Local Rule 7.1(c)(3), S.D. Fla.  *Id.* at *4.  As explained further below, review of the challenged supplemental materials in this case reveals that, like those at issue in *Del Istmo*, they provide appropriate rebuttal evidence.  Accordingly, the Court denies Plaintiffs' Motion to Strike them.

-5-

*1. Supplemental Cavallone Declaration [D.E. 62-1]*

First, Plaintiffs assert that the Supplemental Declaration of Bruno Cavallone [D.E. 62-1] raises new topics.  In support of this contention, Plaintiffs point to "Mr. Cavallone's belated attempts to discuss his views on delays in the Italian legal system."  D.E. 65 at 2.

It was Plaintiffs, however, who first put this issue in controversy in their Response.  *See* D.E. 58 at 19-20.  Indeed, Plaintiffs admit as much in their Reply brief on the Request to Strike [D.E. 70],[3] opining that delay "is a common argument made in response to forum non conveniens motions."  D.E. 70 at 1.

Plaintiffs also contend that Cavallone specifically was aware of complaints about delays in Italian litigation and thus should have raised this issue in his initial declaration.  D.E. 70 at 1-2. While Cavallone surely could have chosen to address this issue in his original declaration, Plaintiffs point to nothing to show that either Defendants or Cavallone were under any obligation to raise the issue preemptively.  Although Plaintiffs correctly describe delay as a common argument relied upon to challenge a motion to dismiss for *forum non conveniens*, neither of the two cases cited by Plaintiffs, nor any cases found by this Court, indicate that delay has ever specifically rendered Italy in particular inadequate under a *forum non conveniens* analysis.  In fact, one of Plaintiffs' cases *affirms* Italy is an adequate forum, albeit nowhere addressing the issue of delay.  *King v. Cessna Aircraft Co.*, 562 F.3d 1374 (11th Cir. 2009) ("*King*").  Since Italian litigation delays do not appear to have previously rendered Italy an inadequate forum in a *forum non conveniens* analysis,

_____

[3]Ironically, Plaintiffs' Reply brief on the Request to Strike [D.E. 70] is, in some respects, guilty of the same charges that Plaintiffs have leveled against Defendants' Reply brief to the Motion to Dismiss.  In this regard, Plaintiffs' Reply brief expands and elaborates on the arguments in their original Request rather than rebutting Defendants' Response.

Defendants were not required to have raised the issue initially.  *See Gold*, 876 F.2d at 1331 n.6.

Because the issue of delay arose for the first time in Plaintiffs' Response brief, the supplemental

Cavallone declaration provides appropriate rebuttal evidence on that issue.

Plaintiffs also challenge the new Cavallone declaration as impermissibly rearguing matters

covered in Defendants' original motion.  D.E. 70 at 2.  In this respect, Plaintiffs contend that

Cavallone's repeated references to testimony in his original declaration amount to reargument, citing

two paragraphs as examples.  *Id.*  This Court's review of the allegedly offensive paragraphs,

however, reveals that the challenged references actually serve to frame Cavallone's rebuttals of

assertions made by Plaintiffs' expert, Bruno Inzitari.  Striking, therefore, is not warranted.

Finally, for the first time, in their Reply in support of their Motion to Strike, Plaintiffs purport

to identify "many inaccuracies" in the Cavallone declaration and assert that they would suffer

"irreparable prejudice" if they are unable to challenge these alleged inaccuracies in a sur-reply.  D.E.

70 at 2.  Yet Plaintiffs were well aware of the contents of the Cavallone declaration when they

initially sought to strike it.  Inexplicably, however, they waited until their Reply, when Defendants

would have no opportunity to respond, to point out the "many inaccuracies" in Cavallone's

supplemental declaration.  As Plaintiffs themselves have noted in their Motion to Strike, waiting to

address known alleged deficiencies until a reply brief is not permissible.  For this reason, the Court

cannot countenance Plaintiffs' objections to the substance of Cavallone's second declaration.

Moreover, even where a party does not ambush its opponent, extra briefing beyond what the Local

Rules permit should be allowed only in exceptional circumstances.  *See, e.g.*, *Crummey v. Soc. Sec.*

*Admin.*, 794 F. Supp. 2d 46, 63 (D.D.C. 2011) ("Where the movant's reply does not expand the

scope of the issues presented, leave to file a surreply will rarely be appropriate.").   In short, Plaintiffs' request to strike Cavallone's supplemental declaration is denied.

*2. Declaration of Marco Lopez de Gonzalo [D.E. 62-2]*

Nor should the Declaration of Marco Lopez de Gonzalo ("Gonzalo") [D.E. 62-2] be stricken as improper new evidence on reply.  Specifically, Plaintiffs complain that Gonzalo was unknown to them prior to Defendants' submission of his declaration and that they will be "unfairly prejudiced" if not permitted to "submit their own evidence addressing the inaccuracies in this declaration."  D.E. 65 at 2.  It is not the identity of the declarant, however, that drives the appropriateness of rebuttal evidence.  Rather, the content of the proposed rebuttal evidence is what matters in determining whether such evidence is admissible.

Here, Plaintiffs' expert Inzitari first raised the *Moby Prince* incident, which Gonzalo's declaration addresses, as an example of excessive delays in the Italian court system, suggesting that no civil or criminal proceeding has successfully found anyone liable for the 1991 accident and that the victims are still waiting for justice.  D.E. 58-29 ¶ 25.  In so doing, however, Inzitari provided no specifics on any pending or completed legal proceedings, noting only generally that parties were "acquitted."  *Id*.  The Gonzalo declaration contends that most of the *Moby Prince* civil claims settled within eighteen months, and all of them within sixty months.  D.E. 62-2 ¶ 6.  Regardless of the credibility or veracity of the Gonzalo declaration, it plainly directly and properly rebuts Inzitari's assertion that victims are still waiting for justice.

Finally, as with the second Cavallone declaration, Plaintiffs first brought up the specific alleged inaccuracies in the Gonzalo declaration in their Reply in support of their Motion to Strike,

even though they must have known of them at the time that they filed their original Motion to Strike. As a result, permitting a sur-reply to the Motion to Dismiss on the basis that the Gonzalo declaration contains inaccuracies is not otherwise justified.

### 3. Costa Crociere S.p.A.'s Second Amended Objections and Answers to Plaintiffs' First Set of Interrogatories [D.E. 62-6]

Finally, Plaintiffs seek to exclude Costa Crociere S.p.A.'s Second Amended Objections and Answers to Plaintiffs' First Set of Interrogatories ("Interrogatory Answers") [D.E. 62-6] on the basis that Defendants obviously knew the information contained therein prior to submitting their Motion to Dismiss. D.E. 65 at 2-3. Specifically, Defendants offer the information provided by the Interrogatory Answers — the identities of witnesses located in Italy and the topics that they would testify about — to directly rebut Plaintiffs' contention that "many purported witnesses in Italy" have no information relevant to Plaintiffs' specific claims. D.E. 68 at 6; D.E. 58 at 25.

Because the Court agrees that this information constitutes appropriate rebuttal to Plaintiffs' attacks on the significance of Defendants' witnesses, the fact that Defendants were aware of the facts contained in Costa Crociere S.p.A.'s Interrogatory Answers at the time that they filed their initial Motion to Dismiss matters not. Nothing requires a party to submit all evidence known, no matter its relevance to the motion, at the time of filing a motion. Instead, regardless of the time learned, evidence constitutes rebuttal where it directly refutes a point raised for the first time in opposition to a motion. For these reasons, Plaintiffs' request to strike must be denied.

## B. Defendants' "Correction" Declarations

Relatedly, in an attachment to their Response in Opposition to Defendants' Motion to

Dismiss [D.E. 58], Plaintiffs also seek to exclude declarations submitted by Defendants from Alessandro Carella [D.E. 16-1], Enrique Miguez [D.E. 16-2], and Ruben Perez [D.E. 16-3]. D.E. 58-32. Plaintiffs base this request on the failure of each declaration to include a date of execution as required by 28 U.S.C. § 1746. D.E. 58-32 at 1-2. To remedy this apparent oversight, in support of Defendants' Reply brief, Defendants filed three brief additional declarations from Carella [D.E. 62-3], Miguez [D.E. 62-4], and Perez [D.E. 62-5], each asserting the date on which his prior declaration had been executed. Plaintiffs seek to strike these correction declarations as well, on the basis that they were "unfairly prejudiced [between the filing of the original declarations and the filing of the additional declarations] because they did not have possession of valid, admissible declarations while conducting their discovery." D.E. 65 at 3.

The Court respectfully rejects Plaintiffs' request to strike the declarations. Under 28 U.S.C. § 1746, an unsworn declaration carries the same force as a sworn statement, as long as it is in writing, signed by the declarant as true under penalty of perjury, and dated, and the verification is in

substantially the following form:

(1)     If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).

(Signature)".

(2)     If executed within the United States, . . . : "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

*Id.*

Here, all of the original declarations bear the certification, "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. [Signature]." *See* D.E. 16-1; D.E. 16-2; D.E. 16-3.  Missing from each original declaration is the date of execution, but the supplemental declarations aim to remedy that deficiency.  Each supplemental declaration specifies the date on which the declarant executed the original declaration and further bears the same certification as in the original declarations, but contains the further statement, "Executed on [date]." D.E. 62-3.  The Court concludes that these circumstances render all of the declarations valid.

When a declarant fails to include a signed and dated declaration under penalty of perjury, courts will disregard the substance of the statement.  *See Lelieve v. Oroso*, 846 F. Supp. 2d 1294, 1299 n.2 (S.D. Fla. 2012).  But while Section 1746 proposes specific language, it requires only that the certificate be in "substantially" similar form to that language, and courts have found that strict compliance is not required. 28 U.S.C. § 1756; *Smith v. Muscatell* (*In re Muscatell*), 106 B.R. 307, 309 (M.D. Fla. 1989) ("[A]s long as the unsworn declaration includes the phrase, 'penalty of perjury,' and states the document is true, the verification requirements . . . will be satisfied.") (footnote omitted).  Nor is the lack of a date of execution fatal to such statements "if extrinsic evidence could demonstrate the period when the document was signed." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475-76 (6th Cir. 2002) (citing *EEOC v. World's Finest Chocolate, Inc.*, 701 F. Supp. 637, 639 (N.D. Ill. 1988) (finding a twelve-day signing window acceptable).  *But see Counts v. Kraton Polymers, U.S., LLC*, 260 F. App'x 825, 829 (6th Cir. 2008) (affirming that district court did

not abuse its discretion by striking undated declaration).   Courts have also found subsequent declarations attesting to the date of prior declarations, such as in the pending case, to constitute an acceptable means of curing an undated declaration that is otherwise valid.  *Peters*, 285 F.3d at 476 (accepting a curing affidavit over a month after the original one was executed).   Absent any questions about the authenticity of such declarations or any showing that a lack of date has somehow prejudiced the opposing party, this Court agrees with the approach outlined by the *Peters* Court, accepting otherwise valid, undated declarations if the approximate signing date can be determined from extrinsic evidence, including a properly executed subsequent declaration setting forth the date of execution of the original declaration.

Here, the later declarations attesting to the dates of execution of the original declarations, in and of themselves, provide sufficient indicia of the dates of execution of the original declarations. But the record further supports that the time frame in which the original declarations could have been executed was, at most, twenty-two days long, since the Complaint was filed on May 3, 2012, and the original declarations were filed on May 25, 2012.   Under *Peters* and in consideration of the time sensitivity of the particular matters discussed in the declarations, a twenty-two day period in which the affidavits could have been executed is sufficiently precise under the circumstances for the Court to find authentication under Section 1746.  Indeed, Plaintiffs do not contest the authenticity of either the original declarations or the correction declarations.

Instead, Plaintiffs complain that they have been "unfairly prejudiced" by the undated original declarations because they "did not have possession of valid, admissible declarations" while conducting their initial forty-five day discovery concerning the *forum non conveniens* motion.  *See*

-12-

D.E. 65 at 3; D.E. 25 (order permitting discovery).  Beyond the conclusory assertion of prejudice, however, Plaintiffs provide no specific details about what prejudice they have suffered or will suffer from the undated, or date-corrected, declarations, and such prejudice is not apparent to this Court.

Moreover, Plaintiffs' characterization of any their period without access to "valid, admissible declarations" is somewhat misleading; they did have possession of the original declarations as of the time of filing through the Court's electronic filing system.  If Plaintiffs were concerned about any impact that the validity or admissibility of the declarations might have had on their limited discovery, they were free to bring that to the Court's attention at any time before or during discovery, including in their motion requesting *forum non conveniens* discovery in which they acknowledged possession of the original declarations, D.E. 22 at 9, or in their response brief challenging Defendants' emergency motion to enforce the Court's discovery order.  D.E. 39.  Conspicuously absent from both of these filings, however, was any mention of prejudice stemming from the fact that the original declarations lacked execution dates, or even any complaint about the absence of execution dates. To the contrary, in Plaintiffs' response to Defendants' emergency motion to enforce the Court's discovery order [D.E. 39], Plaintiffs repeatedly referred to the original declarations as putting topics at issue on which Plaintiffs sought discovery.  *See, e.g.*, D.E. 39 at 2, 4-6, 8.  Since  execution dates for the declarations can be determined from extrinsic evidence and Plaintiffs have failed to establish any prejudice that they have suffered because of the lack of execution dates on the original declarations, Plaintiffs' request to strike the original declarations and to exclude the correction declarations must be denied.

-13-

### III.  Motion to Dismiss on Forum Non Conveniens Grounds

Ordinarily, a plaintiff's original choice of forum should rarely be disturbed.  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).  Under certain circumstances, though, a court may appropriately dismiss a case based on the doctrine of *forum non conveniens* when "trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court and where the plaintiff is unable to aver any specific reasons of convenience supporting its choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981).  To demonstrate that a *forum non conveniens* dismissal is warranted, the moving defendant must establish "that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).  When a court is satisfied that an alternative forum is available and the balance of the pubic and private factors tip in favor of the defendant, a court may exercise its discretion and dismiss the case.  *See Piper Aircraft*, 454 U.S. at 257.

### A.  Availability and Adequacy of an Alternative Forum

The first step in a *forum non conveniens* analysis requires the defendant to demonstrate that "an adequate alternative forum is available." *Leon*, 251 F.3d at 1311.  Courts consider availability and adequacy separately.  *Id.*  Under this analysis, an alternative forum is available to a plaintiff "when the foreign court can assert jurisdiction over the litigation sought to be transferred," and "the defendant is 'amenable to process' in the other jurisdiction." *Id.*; *King*, 562 F.3d at 1382 (quoting *Piper Aircraft*, 454 U.S. at 254 n.22).

To satisfy availability, courts have permitted or required defendants to consent to service of

-14-

process and to waive any subsequent objections to jurisdiction. *See, e.g.*, *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011) (defendants consented to receiving process, tolling statutes of limitation, making witnesses and documents available, and respecting judgment of foreign court); *King*, 562 F.3d at 1382; *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1282-83 (11th Cir. 2001) (consent to jurisdiction satisfied availability); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430-31 (11th Cir. 1996) (district court "wisely attached" conditions to dismissal including consent to jurisdiction, waiver of statute of limitations or jurisdictional defenses, and acceptance of final judgment).  Courts have also conditioned a *forum non conveniens* dismissal on parties' consent to reinstatement of the suit in the original forum if the alternative forum does not exercise jurisdiction. *Leon*, 251 F.3d at 1313 (citing *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 607 (10th Cir. 1998)).

        As for adequacy, if a forum "provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries," the forum satisfies the demands of "adequacy." *King*, 562 F.3d at 1382.  "An adequate forum need not be a perfect forum," and a forum does not suffer from inadequacy unless the remedy it offers is "clearly unsatisfactory" or "no remedy at all." *Satz*, 244 F.3d at 1283.  "Some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Id.* (quoting *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir. 1990).  On the other hand, "extreme amounts of partiality or inefficiency may render the alternative forum inadequate." *Leon*, 251 F.3d at 1312 (citing *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220,

1227-31 (3d Cir. 1995)).[4]

Decisions in this district and elsewhere have found that the lack of class-action procedures in a forum does not render that forum inadequate.  *See, e.g., Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002) ("While the need for thousands of individual plaintiffs to authorize the action in their names is more burdensome than having them represented . . . in a class action, it is not so burdensome as to deprive the plaintiffs of an effective alternative forum."); *In re Banco Santander Securities–Optimal Litigation*, 732 F. Supp. 2d 1305, 1333-35 (S.D. Fla. 2010) ("[T]he lack of a class action mechanism does not weigh against finding that an alternative forum is adequate.").  At most, the lack of a class-action mechanism in a forum influences the issue of convenience in the balance of the private and public interest factors, but it does not make a forum inadequate in the initial inquiry.  *See In re Banco Santander*, 732 F. Supp. 2d at 1334 (citing *Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 482 (S.D.N.Y. 2006)).  In those cases where courts have rejected *forum non conveniens* dismissals in part based on the lack of a class-action mechanism, they have not done so solely on that basis.  Indeed, unlike in the present matter, at least some members of the plaintiff classes in such cases were United States citizens filing in their home forum.  *In re Lernout & Hauspie Securities Litigation*, 208 F. Supp. 2d 74, 91-92 (D. Mass. 2002);  *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 121, 122, 126-27, 131-32 (E.D.N.Y. 2000).

---

[4]In *Bhatnagar*, the Third Circuit concluded that delays facing "average litigation" upwards of twenty-five years were "intolerable." *Id.* at 1228. In affirming the district court's decision, the court credited the plaintiff's experts, who provided statistical and anecdotal evidence of the delays in Indian courts, with the failure of the defendants to demonstrate that the delays were either non-existent or would not adversely impact the specific suit. *Id.* at 1229.

As noted, severe delays can also raise doubts about the adequacy of a foreign forum.  *Leon*, 251 F. 3d at 1312.  In the Eleventh Circuit, when courts examine the issue of efficiency,

> defendants have the ultimate burden of persuasion, but only where the plaintiff has substantiated his allegations of serious corruption or delay.  Thus, where allegations are insubstantially supported, . . . a District Court may reject them without considering any evidence from the defendant.  But where the plaintiff produces significant evidence documenting the partiality or delay (in years) typically associated with the adjudication of similar claims, and these conditions are so severe as to call the adequacy of the forum into doubt, then the defendant has the burden to persuade the District Court that the facts are otherwise.

*Id.*  Thus, a plaintiff opposing dismissal must produce significant evidence documenting delay as the rule for this type of litigation.

### 1. Availability of Italy as a Forum

Italy has repeatedly been recognized by the Eleventh Circuit and other courts as an available and adequate forum.  *See, e.g.*, *Membreno v. Costa Crociere, S.p.A.*, 425 F.3d 932, 937-38 (11th Cir. 2005); *Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 300, (3d Cir. 2010); *Bautista v. Cruise Ships Catering & Serv. Int'l.*, N.V., 350 F. Supp. 2d 987, 990-91 (S.D. Fla. 2003).  Notably, Italy's adequacy is not limited to small or simple cases; to the contrary, Italy has been found adequate for mass tort actions and proposed class actions, such as the one filed by Plaintiffs.  *See, e.g., King*, 562 F.3d at 1378, 1382-83; *In re Vioxx Prods. Liab. Litig.*, 448 F. Supp. 2d 741, 746 (E.D. La. 2006). While not dispositive of the issues presented in this case, the evaluations of Italy's availability and adequacy conducted by these other courts — including the Eleventh Circuit — certainly suggest the availability and adequacy of Italy as a forum.

Plaintiffs contest the availability of an Italian forum on two grounds.  First, they contend that

Article 2497(3) of the Italian Civil Code allows plaintiffs to pursue a parent corporation only after they have not been satisfied by the subsidiary.  D.E. 58 at 18; D.E. 58-29 at 80 (translation of statute).  Thus, Plaintiffs argue that they could file suit against Carnival, Carnival plc, and CCL only after they had filed suit against Costa, obtained a judgment against Costa, and that judgment remained unsatisfied.  *Id.*

Article 2497(3), however, appears to be a post-judgment veil-piercing statute.  In this regard, as translated, Article 2497(3) provides, "The shareholder and the creditor may act against the corporation or entity that is exercising the corporate control and coordination, only if they have not been satisfied by the company that is subject to the control and coordination."  D.E. 58-29.  Here, Plaintiffs assert claims of negligence, gross negligence, and nuisance *directly* against Carnival, Carnival plc, and CCL, *see* D.E. 1 at 16, 19, 21, not simply claims against Carnival's subsidiaries or related companies for which Plaintiffs seek to hold Carnival liable vicariously.  As a result, it is, at best, questionable whether the provision would even be applicable.  *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1580 (11th Cir. 1986) (treating veil-piercing and direct claims as distinct theories of liability).

But, even assuming, *arguendo*, that Article 2497(3) requires Plaintiffs first to obtain a judgment against Costa which Costa does not satisfy before they could sue other Defendants, as noted above, the issue of availability concerns the issue of jurisdiction, not of judgment satisfaction. Plaintiffs do not suggest that they could never obtain jurisdiction over Carnival, Carnival plc, and CCL under Article 2497(3) — just that they could not obtain jurisdiction over them until after the initial lawsuit.  *Id.*  Even if Plaintiffs are correct, this fact does not render Italy an unavailable forum.

-18-

As a second basis for contesting availability, Plaintiffs argue that Defendants' consent to jurisdiction is "illusory." D.E. 58 at 18. In their Motion to Dismiss, Defendants have agreed to the jurisdiction of the Italian courts for any action filed by Plaintiffs within 120 days of an order by this Court dismissing the case. D.E. 16 at 15. Plaintiffs describe this consent as inadequate because, according to Plaintiffs, it would be practically impossible to prepare and file pleadings for all Plaintiffs within a 120-day period. D.E. 58 at 18-19.

As noted above, a defendant's consent to jurisdiction is sufficient to establish the availability of a forum. *See, e.g.*, *Tazoe*, 631 F.3d at 1330; *King*, 562 F.3d at 1382; *Satz*, 244 F.3d at 1282-83. But the jurisdictional consent must reasonable enough to be attainable as a practical matter. In order to ensure the availability of a forum, therefore, a court is permitted to attach conditions to a *forum non conveniens* dismissal. *See Leon*, 251 F.3d at 1313; *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478-79 (2d Cir. 2002) (modifying dismissal to require defendants to waive statute-of-limitations objections concerning nearly 55,000 plaintiffs for a period of one year after dismissal).

Here, Defendants' consent to jurisdiction establishes Italy as an available forum. But the Court agrees with Plaintiffs that 120 days to file multiple Plaintiffs' cases separately may well not be a sufficient period. Therefore, the Court finds Italy to be an available forum, so long as (1) Defendants consent to jurisdiction and service of process for any action refiled by Plaintiffs in Italy for a period of 270 days from the date of this Order; (2) Defendants waive raising any jurisdictional objections in these actions; and (3) Defendants agree to the reinstatement of the suit in this forum if the Italian court refuses to recognize Defendants' consent to jurisdiction. Should Defendants refuse or fail to comply with any of these conditions, Italy would not be an available forum.

-19-

*2.  Adequacy of Italy as a Forum*

Plaintiffs contest the adequacy of Italy as a forum on two grounds.  First, Plaintiffs assert that excessive delays in the Italian court system will effectively deprive Plaintiffs of any remedy at all.  D.E. 58 at 19.  In support of this position, Plaintiffs offer the professional opinion of their expert, Inzitari, that it "would take a minimum of 15, and likely in excess of 20 years" for Plaintiffs' claims to be finally resolved, including appeals.[5]  *Id.* at 20; D.E. 58-29 ¶ 14.  In support of Inzitari's prognosis, Plaintiffs have referenced two Italian Ministry of Justice Reports from 2008 and 2011.  The reports found the average duration of trial-court proceedings lasted just over three years, and proceedings in the Court of Appeals lasted another three to four years for a total of six to seven years of legal proceedings.  *Id.* ¶ 15.  Inzitari then speculated that appeals to Italy's Supreme Court of Cassation would take another three years.  *Id*. ¶ 16.

To arrive at the longer fifteen-to-twenty-year estimated time frame for this particular case, Inzitari referred to four mass disasters that had occurred in Italy and asserted that they demonstrate the excessive delays that would face a mass-disaster case such as this one.  Specifically, these incidents include a 1976 chemical disaster in Seveso, in which the civil proceedings ended in 2009; a 1980 airplane crash in Ustica in which civil trial proceedings ended in 2010, but appeals will not commence until 2014; a 1991 fire on the *Moby Prince* ferry; and a 2009 railway accident in Viareggio.  D.E. 58-29 ¶¶ 20-27.

---

[5]The Italian civil court system has a three-tiered structure: trial courts (*tribunali*), courts of appeal (*corti d'appello*), that review issues of both law and fact, and the Supreme Court of Cassation (*corte di cassazione*), a court of last resort that reviews only questions of law. D.E. 16-4 ¶ 4; D.E. 58-29 ¶ 13.

Significantly, though, in the Seveso and Ustica cases where Inzitari provides a date for the conclusion of the proceedings, he fails to identify a date on which those proceedings began, or any other description of their procedural history. *Id.* ¶¶ 20-23. The only related documents attached are two Italian news articles, neither of which provides details on the length of the actual proceedings. *Id.* at 58, 60.

As for the *Moby Prince* disaster, Inzitari notes that all parties were "acquitted" at both the trial and Supreme Court of Cassation levels but does not indicate at all when these proceedings occurred. *Id.* ¶ 25. Regarding the railway disaster, Inzitari notes that the Italian Parliament approved legislation in 2012 creating a compensation fund for the victims. According to Inzitari, this legislation "was an acknowledgment of the inability of the Italian legal system . . . to provide, within a reasonable period of time, a large number of victims who sustained injury with relief." *Id.* ¶ 27. However, Inzitari neither cites nor includes any documents regarding this legislation.

Defendants' expert Cavallone counters the Seveso example by noting that many of the proceedings concluded in 2009 were initiated only after the Italian Supreme Court had ruled on the novel question of non-economic damages in 2002. D.E. 62-1 ¶ 6. He also asserts that the cases involving the Ustica crash were not filed until 2007 and suggests that the legislatively enacted compensation fund for the railway accident proves nothing about the length of proceedings in Italy. *Id.* ¶ 7-8. Similarly, Defendants' expert Gonzalo, who represented the operator of the *Moby Prince* in legal proceedings against the operator, attests that the vast majority of the *Moby Prince* claims were settled with eighteen months of the accident, and all of them were settled within sixty months. D.E. 62-2 ¶ 6.

-21-

As noted above, Plaintiffs must substantiate their claims of delay in a foreign justice system with "significant evidence." *Leon*, 251 F. 3d at 1312. While Plaintiffs' evidence that an "average" trial may take approximately three years and appeals another three to four after that is significant and undisputed by Defendants, a delay of three years at the trial level does not approach the trial-level delays of close to twenty-five years faced by the plaintiffs in *Bhatnagar*. 52 F.3d at 1228. Even with first-level appeals of four years and final appeals[6] lasting another three years, the Court cannot conclude that ten years total rises to the same level of extreme inadequacy of the eighteen to twenty-six year time frame in *Bhatnagar* so as to effectively leave Plaintiffs with "no remedy at all." *Id.*; *Satz*, 244 F.3d at 1283.

Further, the anecdotal evidence provided by Plaintiffs' expert does not meet the threshold of significance to call into question the adequacy of Italy's courts. In none of Inzitari's examples does he identify a date for the initiation of litigation or set forth facts concerning the procedural history of those cases. Standing alone, the fact that a case was resolved years after *the events* giving rise to the action does not provide any indication of the length of actual legal proceedings in Italy. And, Defendants provide evidence disputing Inzitari's characterization of the alleged delays in such cases and affirmatively demonstrating that the relevant litigation in these mass-disaster cases has lasted a total of, at most, about seven or eight years, in line with the "average" figures discussed above.

_____

[6] The Court assumes the length of final appeals as three years for the sake of argument; however, the Court does not believe Plaintiffs have produced significant evidence on this level of appeals, and Defendants counter that relatively few cases ever reach the Supreme Court of Cassation anyway.

Nor does the fact that victims have not "received justice" bear on the adequacy of the forum if the reason that there has allegedly been no "justice" results solely from the fact that the parties believed responsible have been acquitted of responsibility in appropriate legal proceedings. A forum is not inadequate just because it does not guarantee a litigant's victory. And finally, the unverified intent of the Italian Parliament in establishing a victim compensation fund for one disaster does not render the Italian courts inadequate as matter of law in a *forum non conveniens* analysis.

Plaintiffs next attack the adequacy of an Italian forum because Italian law lacks a class-action or mass-joinder procedure. D.E. 58 at 21. As noted above, however, the lack of a class-action procedure, in and of itself, generally does not support finding a forum inadequate. *In re Banco Santander*, 732 F. Supp. 2d at 1335; *Aguinda*, 303 F.3d at 478. The cases Plaintiffs cite where lack of a class-action mechanism did contribute to rendering the alternative forum inadequate are distinguishable.

In *In Re Lernout*, Belgium was found in adequate partially because it lacked a class-action mechanism. 208 F. Supp. 2d at 92. But the Court rested its conclusion on the *combined* lack of a class-action mechanism and absence of a "fraud-on-the-market" theory of liability. *Id.* Additionally, unlike in the pending matter, where the incident at the heart of the litigation occurred in Italy, the alleged fraud concerned stock that had been purchased on an American stock exchange, creating a strong tie to the United States forum. *Id.*

Plaintiffs' other case, *Bodner*, was brought by American plaintiffs in their home forum, entitling them to more deference than Plaintiffs here, *see infra*, and the defendants failed to establish that the legal claim was even actionable in the alternative forum. 114 F. Supp. 2d at 131-32. Thus,

although the lack of a class-action mechanism "strengthened" the inadequacy argument, it was not dispositive. *Id.* at 132. Here, unlike in *Bodner*, none of Plaintiffs are American, and Italy provides adequate substantive law for resolving tort claims. *King*, 562 F.3d at 1378, 1382-83; *In re Vioxx*, 448 F. Supp. 2d at 746. As a result, the lack of a class-action mechanism is not sufficient on its own to establish inadequacy.

Finally, the Court notes that although Plaintiffs contend that they cannot maintain a mass-joinder action in Italy, they base their argument on the procedural inconvenience of using such a procedure, not on the unavailability of it. D.E. 58 at 21. In this regard, Plaintiffs complain that it would be "impossible" to litigate a mass-joinder action because each of the 1,000 Plaintiffs would still have to file claims individually, and the representative lawyer would have to file separate pleadings for each before joinder could occur. In *Aguinda*, however,[7] the court expressly found that "[w]hile the need for thousands of individual plaintiffs to authorize the action in their names is more burdensome than having them represented by a representative class action, it is not so burdensome as to deprive the plaintiffs of an effective alternative forum." 303 F.3d at 478. As *Aguinda* involved 55,000 plaintiffs and the instant case regards 1,000, the Court cannot conclude that maintaining a mass-joinder action in Italy would be an "impossible" burden. Consequently, the Court finds Italy to be both an available and adequate alternative forum for Plaintiffs' case.

---

[7]Plaintiffs attempt to distinguish *Aguinda* by noting that in dismissing the case to Ecuador, the plaintiffs there could join in an action brought by the state and the state-owned PetroEcuador, neither of whom were parties to the United States case. D.E. 58 at 22 n.10. With whom the plaintiffs could join suit, however, is irrelevant to whether the mass joinder of thousands of plaintiffs is so logistically burdensome as to render the procedure impossibly ineffective.

-24-

**B. Private and Public Interest Factors**

If an alternative forum is available and adequate, the Court next must balance the private-
and public-interest factors. *King*, 562 F.3d at 1381.  The private-interest factors to be considered,
as laid out by the Supreme Court in *Gilbert*, include (1) the relative ease of access to sources of
proof; (2) the availability of compulsory process  for compelling unwilling witnesses; (3) the costs
of obtaining willing witnesses; (4) the possibility of viewing the premises in question, if such
viewing is appropriate; (5) the enforceability of a judgment; and (6) "all other practical problems that
make trial of a case easy, expeditious and inexpensive." *Id.* (quoting *Gilbert*, 330 U.S. at 508-09).
The public-interest factors to consider "include each forum's interest in hearing the case, the
administrative burdens placed on the Court in hearing the case, and the need to apply foreign law."
*Id.* at 1384 (citing *Gilbert*, 330 U.S. at 508-09).  "In cases which touch the affairs of many persons,
there is reason for holding the trial in their view and reach rather than in remote" locations. *Gilbert*,
330 U.S. at 509.

Generally, a court will evaluate the private interest factors first.  *King*, 562 F.3d at 1382.  If
the court finds the private interests "to be in equipoise or near equipoise" it will turn to the public
interest factors to tip the balance.  *Id.* (quoting *La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307
(11th Cir. 1983). But both sets of factors are to be considered by courts in all *forum non conveniens*
cases. *Leon*, 251 F.3d at 1311.

*1.  Private-interest Factors*[8]

In analyzing a motion to dismiss under the *forum non conveniens* doctrine, a strong presumption exists against disturbing a plaintiff's choice of forum.  *See SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004) (citing *Gilbert*, 330 U.S. at 508).  The deference afforded to the plaintiff is strongest when the plaintiff is a United States citizen, resident, or corporation filing in the courts of the United States.  *Id.*; *see also Piper Aircraft*, 454 U.S. at 255-56 (citing *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)).  However, "[b]ecause the central purpose of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference."  *Id.*

In some cases, foreign plaintiffs hail from countries that have bilateral treaties with the United States guaranteeing those foreign nationals access to and rights in United States courts "upon terms no less favorable than the terms which are or may hereafter be accorded to" United States nationals.  *See, e.g.*, Treaty of Friendship, Commerce and Navigation, U.S.-Italy, art. V, ¶ 4, Feb. 2, 1948, 63 Stat. 2255.  The Eleventh Circuit has taken the position, however, that such treaties do not require that a foreign plaintiff of a treaty nation receive the same level of deference as a United States citizen filing suit at home.  *King*, 562 F.3d at 1382-83 (treaty-covered plaintiffs "are only entitled,

---

[8]In addition to the factors analyzed below, Plaintiffs assert a number of facts that they contend prove the United States is a more "convenient" forum, including the fact that Carnival, Carnival plc, and CCL all have offices in Florida; Costa has a liquor license in Florida, and CCL operates as Costa's agent in Florida. D.E. 58 at 22-23.  While convenience is indeed the "touchstone" of a *forum non conveniens* analysis, that convenience must be related to the case at hand.  These facts speak less to the convenience of trying this specific action in the United States, however, and more to jurisdiction, which is not at issue in the pending Motion to Dismiss.

at best, to the lesser deference afforded to a United States citizen living abroad who sues in a U.S. forum" ) (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 73 (2d Cir. 2003)). As the Eleventh Circuit has explained, "Just as it would be less reasonable to presume an American citizen living abroad would choose an American forum for convenience, so too can we presume a foreign plaintiff does not choose to litigate in the United States for convenience." *Id.* at 1383. And, "although citizenship often acts as a proxy for convenience in the *forum non conveniens* analysis, the appropriate inquiry is indeed convenience." *Id.*

In *King,* the appellate panel affirmed the district court's application of a less deferential standard that made no reference to the foreign plaintiffs' treaty status. *Id.*; *see King ex rel. Estate of King v. Cessna Aircraft Co.*, 405 F. Supp. 2d 1374, 1377 (S.D. Fla. 2005), *vacated and remanded*, 505 F.3d 1160 (11th Cir. 2007). Nevertheless, the Eleventh Circuit specifically noted that a majority of the plaintiffs in that case were from countries that had bilateral treaties with the United States. *See King*, 562 F.3d at 1382 n.2.

Thus, while courts do not give a treaty plaintiff's forum selection the same level of deference as they would a United States citizen, it is not entirely clear whether a foreign plaintiff from a treaty partner receives the same lesser level of deference afforded to all foreign plaintiffs filing away from home, or if a treaty plaintiff is entitled to a "middle" level of deference, somewhat higher than that given to non-treaty foreign plaintiffs. The *King* Court's quoting of *Pollux Holding Ltd.*'s language that a foreign treaty plaintiff is entitled, "at best, to the lesser deference afforded to a United States citizen living abroad who sues in a U.S. forum" suggests a middle level, but its affirmation of the district court's analysis, which did not acknowledge a standard of deference for foreign treaty

plaintiffs that differed from one for foreign non-treaty plaintiffs, supports the notion that just a single standard of lesser deference exists.

Unsurprisingly, Plaintiffs in this case insist that they are entitled to the "heightened" middle level of deference, D.E. 58 at 18, while Defendants urge the Court to conclude that Plaintiffs should receive only the "less deference" accorded foreign plaintiffs, *see* D.E. 61 at 7.  Because the burden of persuasion in a *forum non conveniens* analysis falls on the defendant, *Leon*, 251 F.3d at 1311, for purposes of this analysis, this Court will discount the deference afforded Plaintiffs' choice of forum only by that amount that it would for a United States citizen abroad filing in this Court.  *See Pollux Holding Ltd.*, 329 F.3d at 73.  With this in mind, the Court turns to the other private-interest factors.

The private-interest factor often viewed as the most important is the litigants' access to sources of evidence.  *See, e.g.*, *Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003).  To conduct this analysis, a court must consider the elements of the plaintiffs' causes of action, consider the evidence necessary to prove or disprove each element, and make a reasoned assessment as to the likely location of such proof.  *Id.*  Plaintiffs' Complaint alleges three causes of action against Defendants: negligence, gross negligence, and nuisance.[9]  Under Florida law, as in many other jurisdictions, to sustain a claim of negligence, Plaintiffs must prove "a duty, breach of that duty,

---

[9]While both parties thoroughly briefed the procedural aspects of Italian civil litigation, they did not provide much information regarding the substantive Italian law governing Plaintiffs' claims.  But the parties did not suggest that equivalent causes of action for those pled in the instant case do not exist in Italy.  Therefore, the Court will rely on general principles of tort law and Florida law to outline the required elements of Plaintiffs' claims.  Of course, in referencing these elements to guide its analysis, the Court is not deciding that Florida law applies to Plaintiffs' claims.  In fact, it is more likely that Italian law would apply under a choice of law analysis.  *See infra*.

causation, and damages." *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (citing *Curd v. Mosaic Fertilizer, L.L.C.*, 39 So. 3d 1216, 1227 (Fla. 2010)). To establish "gross negligence," Plaintiffs must also show that "the defendant had knowledge of the existence of circumstances which constitutes a 'clear and present danger' and yet still undertakes 'a conscious, voluntary act or omission . . . which is likely to result in injury.'" *Hager v. Live Nation Motor Sports, Inc.*, 665 F. Supp. 2d 1290, 1294 (S.D. Fla. 2009) (quoting *Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1377 (11th Cir. 2000)). A private nuisance action requires an invasion of another's interest in the private use and enjoyment of land, caused by conduct that is intentional and unreasonable or unintentional but negligent or reckless. Restatement (Second) of Torts § 822 (1979).

The duty element of the negligence action requires Plaintiffs to establish that all Defendants controlled and operated the *Costa Concordia* and owed a duty of care to the resident Plaintiffs of Giglio Island in operating the vessel. It seems likely that evidence of this element, particularly relating to the level of control exerted over the vessel, will come from documents and witnesses found in the Defendants' corporate offices, *i.e.*, in the United States and Italy, as well as in the United Kingdom (in the case of Carnival plc). As such, access to proof of the duty element presents a wash in this analysis.

Analysis of the access to evidence of the breach and causation elements, however, tilts towards Italy. Plaintiffs contend, in part,[10] that all Defendants breached their duty of care by failing

---

[10]Although Plaintiffs' brief in opposition to the Motion to Dismiss focuses on the "policy" theory of negligence only, Plaintiffs' Complaint also alleges other theories, including,

to "develop, approve, implement, and monitor compliance with policies and procedures applicable to [Costa]," and this failure caused Plaintiffs' injuries.  D.E. 58 at 25.  While evidence regarding "developing" and "approving" policies concerning two Defendants (Carnival and CCL) is likely to be found in the United States, such evidence as it relates to Carnival plc and Costa is more probably located in Europe.  *Compare* D.E. 58 at 23 (identifying eleven policy-related witnesses in south Florida) *with* D.E. 62-6 at 11-16 (identifying several dozen policy-related witnesses in Italy).  Furthermore, implementation and monitoring evidence is likely available almost exclusively in Europe, as it requires proof of how Defendants did or did not put into place and keep track of compliance with policies aboard the *Costa Concordia*, an *Italian*-flagged vessel crewed by *Italian* officers trained largely at a facility (CSMART) in the *Netherlands*.  This will necessarily involve testimony from the crew,[11] witnesses at the training facility, and individuals who were in a position

---

among others, operating the vessel at negligent speeds, operating without appropriately using navigational technology, failing to conduct safety drills, and retaining an irresponsible captain. D.E. 1 at 17-18.  Plaintiffs have not amended their complaint to abandon these theories of liability, and the Court cannot ignore them in its *forum non conveniens* analysis.

[11]Plaintiffs point out that the vessel's captain and several officers are the subject of criminal proceedings in Italy and suggest that, as a result, their testimony is "inaccessible" to Plaintiffs because of self-incrimination concerns.  D.E. 58 at 28.  Whether a witness will invoke a privilege to avoid testifying, however, does not figure into the *forum non conveniens* analysis concerning the location of witnesses necessary to prove an element of the claim.  First, whether and for how long the criminal proceedings that protect these witnesses from being required to testify remain pending is unknown at this time.  Second, even if the criminal prosecution outlasted the civil case, the fact that Plaintiffs' witnesses might choose not to testify does not mean that the location of such witnesses should be excluded from the analysis.  While mechanisms for compelling testimony might exist with regard to witnesses who are not under criminal prosecution, even they sometimes choose not to testify.  Further, numerous other crew members, not subject to criminal prosecution,  are located in Italy and would likely be available to testify.

to observe the execution of the policies by the crew during the shipwreck and rescue, most of whom are located in Italy or elsewhere in Europe.  *See* D.E. 16 at 17; D.E. 58 at 27.

Defendants also point to several sources of physical proof in Italy that would be relevant to the elements of breach and causation, including data, voice, and video recordings from the vessel; Italian government reports on the vessel's compliance with Italian laws; the vessel's electronic navigation system and maintenance logs; and recordings from a camera on Giglio Island.  D.E. 16 at 17-18.  This evidence is relevant not just to the breach and causation issues of policy implementation, but it is also extremely pertinent to Plaintiffs' other theories of negligence, including activities and distractions on the ship's bridge at the time of the accident.  All of this information is located in Italy, and much of it is within the possession of Italian investigators.  While the parties contest whether they will be allowed access to this evidence for their civil litigation, *see* D.E. 16 at 18; D.E. 58 at 26, the fact remains that it is in the custody of Italian authorities, who are the only ones who can resolve the access issues.

Evidence of the damages suffered by Plaintiffs is also located in Italy.  This includes not only physical evidence of the environmental damage suffered around Giglio Island, but evidence of the economic damages suffered by Plaintiffs.  Proof of the damages will require testimony of Italian witnesses and experts who have made observations of the damage and conducted environmental testing in the area, as well as testimony about the business and tourism losses that have or have not occurred as a result of the accident. The witnesses who would provide this testimony are almost certainly all located in Italy.

The gross negligence action will involve many of the same issues and sources of proof that

the regular negligence action entails.  In particular, the heightened knowledge requirement of gross negligence will necessitate evidence of corporate knowledge of a "clear and present danger" that is likely to be located in the United States, United Kingdom, and Italy.  Thus, at best, access to sources of proof on the gross negligence action is about even in the analysis if just the knowledge element is considered and favors Italy if all elements of gross negligence are considered.

Turning to proof of the elements of nuisance, this consideration also favors Italy.  Proving an invasion into Plaintiffs' use and enjoyment of their land will require many of the same types of evidence required to demonstrate damages in a negligence action, including witness and expert testimony about the nature and extent of the invasion.  As noted above, this evidence is located in Italy.  Likewise, to prove the conduct element of nuisance, Plaintiffs will have to establish negligent or reckless conduct[10] on the part of Defendants, or in other words, will have to prove the elements of their other two causes of action.

While Plaintiffs also contend that an investigation and audit of the accident being conducted by Carnival involves witnesses and documents located in Miami, D.E. 58 at 14, the witnesses identified by Plaintiffs are among the eleven in the United States identified and discussed above. To the extent that documents are presently in Miami, Plaintiffs concede that the European Defendants "routinely and effortlessly" share documents with Carnival and CCL in Florida.  D.E. 58 at 16.  Nothing suggests that the ease of document sharing among these closely related corporate entities does not extend in both directions.  Coupled with the fact that Defendants have agreed to

---

[10]Plaintiffs do not appear to contend that the shipwreck was intentional conduct.

make documents under their control available to an Italian court, *see* D.E. 16 at 8 n.1, this factor is at best, neutral.

Accordingly, the balance of access to sources of proof tips decidedly towards Italy.  Although Plaintiffs have identified eleven witnesses and policy documents in South Florida that would be relevant to proving one of their theories of liability against two Defendants, the vast majority of other relevant witnesses, documents, and physical evidence is located in Italy or elsewhere in Europe.

With regard to the issue of compulsory process to force unwilling witnesses to testify and the costs of obtaining willing witness testimony, Defendants have stipulated to produce witnesses and evidence in their possession, custody, or control to an Italian court that so requests.  D.E. 16 at 19. Similarly, the representative Plaintiffs have agreed to make themselves available to travel to the United States to testify at their own expense.  D.E. 58-30 ¶ 4; D.E. 58-31 ¶ 4.  Thus, compulsory process issues involve third-party witnesses located in the United States and Italy.[11]

Plaintiffs have identified two categories of witnesses in the United States over whom Italian courts could not exercise process:  witnesses from the salvage contractor and experts hired to conduct a comprehensive audit of Costa's policies.  On the flip side, Defendants have pointed to three groups of witnesses of witnesses outside the United States over whom United States courts could not exercise authority: Italian government witnesses, including those responsible for inspecting the vessel and assisting in the rescue efforts; eye witnesses to the accident; and damages witnesses.

---

[11]Third-party witnesses located elsewhere, such as the Netherlands, would present the same compulsory process issues to courts in both countries and therefore do not factor into this analysis.

Although it seems likely that Defendants have identified more witnesses who could not be compelled to testify if this action were tried in the United States, neither side has listed these witnesses with the specificity required to actually balance the issue.  Thus, compulsory process issues face both sides, and this factor is in "equipoise."

Witness-cost issues likewise burden both sides.  The representative Plaintiffs have agreed to cover the "reasonable travel expenses" for any of Defendants' witnesses in Italy or the United Kingdom if Plaintiffs wish to depose or examine those witnesses at trial.[12]   D.E. 58 at 27. Nevertheless, looking at costs in absolute terms, the expense of bringing witnesses from Europe to the United States would likely significantly outweigh the costs of sending witnesses from the United States to Italy, because, as explained above, far more witnesses likely exist in Europe than in the United States.   Further, if this matter is tried in Italy, Plaintiffs will save money because they will not have to cover expenses for any of Defendants' witnesses.  Thus, the costs of obtaining willing witnesses tip the balance to Italy.

The possibility of viewing the shipwreck location, for obvious reasons, tilts in favor of Italy. Defendants contend that familiarity with the accident location is necessary for assessing damages and for granting Plaintiffs' request for an injunction requiring Defendants to adopt a policy for maintaining "minimum safety distances" from Giglio Island in the future.  D.E. 16 at 22.  Plaintiffs contend that viewing the actual site is irrelevant to their claims, but they do not contend that this factor favors trial in the United States.  D.E. 58 at 29.

---

[12]This apparently excludes covering the expenses of any defense witnesses Plaintiffs do not want depose or examine at trial, though.

Considering the nature of the environmental damage alleged and the relief sought, this Court is not convinced that the ability to view the shipwreck and its surroundings is irrelevant. Obviously, to the extent that such a visit becomes important, Italy enjoys an unparalleled edge over the United States as a forum. *See Piper Aircraft*, 454 U.S. at 242 ("Trial would be aided by familiarity with Scottish topography and by easy access to the wreckage.").

As for the enforceability of a judgment, that does not factor into the analysis. Defendants have stipulated to abide by any post-appeal final judgment. D.E. 16 at 8 n.1.

Plaintiffs also raise a number of concerns about costs that they suggest favor retaining the action in the United States. These include translation costs, individual filing costs, the lack of a contingency-fee system in Italy, and the fact that costs are borne by the losing party in Italy. Plaintiffs maintain that translation costs favor trial in the United States because Italian witnesses are more likely to also speak English, while American witnesses are less likely to speak Italian. *See* D.E. 58 at 25, 26. Plaintiffs' general assertions may indeed be correct, but they amount to pure speculation. Indeed, Plaintiffs themselves characterize the issue of translation costs as "[a]t most,. . . a wash." D.E. 58 at 26.

With regard to filing fees in Italy, which are based on the amount of relief requested, Plaintiffs describe them as "staggering." D.E. 58 at 24. Although just an estimate, Plaintiffs contend that for their demand of $75 million in damages, they would incur fees of between $449,000 and $1,100,000, plus taxes. *Id.* Since more than 1,000 Plaintiffs exist, however, this works out to between $449 and $1,100 per Plaintiff if they each filed an individual action. While this Court acknowledges that these fees are not trivial, when considered in light of the total costs of trying the

case in the United States, the Italian filing fees on a *pro rata* basis pale in comparison.

Further, this case is readily distinguishable from the case that Plaintiffs cite in support of their financial hardship argument, *Wilson v. Island Seas Invs., Ltd.*, 590 F.3d 1264 (11th Cir. 2009). In *Wilson*, the plaintiff — a United States citizen who had filed in a United States court — filed an affidavit describing her financial inability to pay court costs and attorney's fees and to pay for witnesses to travel from the United States to the Bahamas. *Id.* at 1268. Here, in contrast, even setting aside the deference accorded the *Wilson* plaintiff because of her status as a United States citizen — a status that Plaintiffs in this case do not enjoy, Plaintiffs have not asserted any inability to pay the costs in Italy. To the contrary, Plaintiffs have not only agreed to pay their own travel expenses to the United States, but also those of some witnesses. Accordingly, Plaintiffs have not established the kind of financial hardship that was present in *Wilson*, and the Court cannot agree that costs of $449 to $1,100 per Plaintiff are so "staggering" as to tip the balance of private factors back to the United States, particularly in light of the rest of the costs associated with litigating the case in the United States.

Turning to the alleged lack of a contingency fee system in Italy, D.E. 58 at 24, the Court first notes that the parties' respective legal experts clash on whether a contingency-fee system is available in Italy. But even assuming, *arguendo,* that such a system does not exist, such a circumstance does not tip the balance of private interests to the United States. In fact, the Eleventh Circuit has held that the lack of a contingency-fee arrangement is a "particularly weak" argument for opposing a *forum non conveniens* dismissal and should not be given substantial weight. *See Mangin*, 91 F.3d at 1430.

Finally, the Court finds that the fact that costs are borne by the loser in Italy, should be given

only marginal weight.  Such a rule does not prevent Plaintiffs from filing their actions in an Italian court.  If Plaintiffs had established a level of financial hardship that would *de facto* have precluded them or any reasonable person from undertaking the risk of a lawsuit, the burden of costs may have weighed more significantly.  But Plaintiffs have not made such a showing.  Consequently, the Court does not conclude that such a rule imposes an undue financial burden on Plaintiffs.

Thus, the balance of private factors tips substantially in favor Defendants.  First, the evidentiary issues overwhelmingly dictate Italy as the better forum.  Not only are the shipwreck and allegedly damaged environment physically located in Italy, but the vast majority of evidence necessary to prove or disprove Plaintiffs' causes of action is also there, while the evidence found in the United States is limited and bears on just a few elements of Plaintiffs' Complaint.  Second, compulsory process issues are, at best, even, with the costs of obtaining willing witnesses tipping towards Defendants and other costs of litigation slightly favoring Plaintiffs.  Even assuming the applicability of a higher level of lesser deference due Plaintiffs, the Court cannot ignore the substantial amounts of evidence located in Italy and concludes that the balance of private-interest factors favors dismissal of this action.

### 2. Public-interest Factors

Even if the balance of private-interest factors were at or near "equipoise" — which it is not, the balance of public-interest factors tips decidedly in favor of dismissal.  Italy has by far the strongest interest in this case.  The *Costa Concordia* was an Italian-flagged vessel managed directly by an Italian company and operated by an Italian crew.  The accident occurred in Italian waters off an Italian island.  It has allegedly directly affected Italian citizens located in Italy and has impacted

the environment and economy of Italy.  Many, if not all, of Plaintiffs are Italian, and none are American.  And Plaintiffs seek an injunction involving access to Italian waters.

The Eleventh Circuit has recognized the strong interest that states have in resolving cases that arise from accidents in their territory.  *See, e.g.*, *King*, 562 F.3d at 1384; *Leon*, 251 F.3d at 1315.  Further, the Italian courts are already hearing criminal and civil proceedings related to this case, establishing its interest in the matter.  *See, e.g.*, *Leon*, 251 F.3d at 1315; *King ex rel. King*, 405 F. Supp. 2d at 1379.  While Plaintiffs claim that these current proceedings "adequately fulfill[]" Italy's interests, Plaintiffs do not even suggest that ongoing Italian legal proceedings address the types of damages asserted in this lawsuit.  Moreover, the fact that Italy may be handling other cases stemming from the *Costa Concordia* disaster does not somehow reduce Italy's strong interest in resolving all matters arising from the accident — particularly this one, where it appears that all Plaintiffs are Italian, all damages occurred in Italy, and the injunction sought would affect access to Italian waters.

Plaintiffs also contend that the United States has an interest in this case because it has a need to enforce safety standards in the cruise-ship industry and because some passengers of the *Costa Concordia* were United States citizens.  D.E. 58 at 30.  While it is undoubtedly true that the United States has such a general interest, so does Italy.  Plaintiffs have not disputed this, nor have they provided any information contesting Italy's blatantly stronger interest in this case.  Nor does the fact that some passengers onboard the *Costa Concordia* happened to have been Americans bear even remotely on the analysis in this case, where not a single United States (or other) passenger is a party to this particular action.  Rather, all Plaintiffs are individuals and business owners in Italy, who claim economic damages arising from the loss of business and environmental assets in Italy, caused by the

*Costa Concordia* disaster, also in Italy.

Additionally, the likelihood that a United States court would have to apply Italian law in this case counsels in favor of dismissal. *King*, 562 F.3d at 1384 (quoting *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 (11th Cir. 1985). Although the parties have not thoroughly briefed the choice-of-law issue and it is premature to determine conclusively which law applies, a number of factors point towards the application of Italian law. First, and foremost, the place of alleged injury was Italy. Second, Defendants have established that Italy has the most significant relationship to the incident. *See Garcia v. Pub. Health Trust of Dade Cnty.*, 841 F.2d 1062, 1064 (noting that Florida applies the most-significant-relationship test). Although this case was brought as a diversity action, D.E. 1 at 1, applying the maritime choice-of-law rules also appears to favor application of Italian law to this dispute.[13] The fact that Italian law would likely apply to many, if not all, of the issues in this case weighs in favor of dismissal.

Finally, although administrative burdens of a case involving 1,000 Plaintiffs and complex issues of tort law will impose burdens on whichever forum hears the case, two specific issues tip the balance slightly in favor of dismissal. For one, having established the significant number of

---

[13]Resolving a conflict between federal maritime law and a foreign country's law involves consideration of eight factors: (1) the place of the wrongful act; (2) the vessel's flag; (3) allegiance or domicile of the injured party; (4) domicile of defendants; (5) place of contract between parties; (6) accessibility of a foreign forum; (7) law of the forum; and (8) defendants' base of operations. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1174 (11th Cir. 2009) (citations omitted). Although the Court is not conducting an extensive analysis of the choice-of-law issue, a cursory examination suggests the first, second, third, sixth, and seventh factors favor Italy in this instance; the fifth is irrelevant, and the fourth and eighth factors split between the United States and Italy because of the different locations of Defendants.

witnesses in Italy and elsewhere in Europe, this Court would need to rely on the lengthy process of letters rogatory to obtain testimony and evidence from foreign witnesses, whereas any such process would be minimized with trial in Italy because Defendants have offered to make witnesses and documents under their control available to Italian courts.  Second, trial of this case would impose significant financial and other burdens on American courts, taxpayers, and jurors who are only "remotely related" to the accident.  *See Warter v. Boston Securities, S.A.*, 380 F. Supp. 2d 1299, 1314-15 (S.D. Fla. 2004) (citations omitted) (noting that administrative costs should be placed on the jurisdiction most significantly related to the dispute).  Accordingly, the public-interest factors all point markedly towards dismissing this action in favor of an Italian forum.

**C.  Undue Inconvenience or Prejudice of Reinstating Suit in Italy**

Because the Court has concluded that Italy is an available and adequate forum and Defendants have stipulated to reinstating this lawsuit in Italy and, as a condition of this dismissal, have waived any objections to jurisdiction, the Court finds that Plaintiffs will be able to reinstate their suit in Italy without any undue inconvenience or prejudice.

### *IV.  Conclusion*

For the foregoing reasons, Defendants' Motion to Dismiss Based on the *Forum Non Conveniens* Doctrine is **GRANTED**, contingent upon the meeting of all of the following conditions:

1.  Defendants must consent to jurisdiction and service of process for any action refiled by Plaintiffs in an Italian court for a period of 270 days from the date of this Order;

2.  Defendants must waive raising any jurisdictional or statute-of-limitations objections to these actions;

-40-

3.   Defendants must make witnesses and documents in their possession, custody, or control that are relevant to these actions available upon the request of an Italian court;

4.   Defendants must respect any post-appeal final judgment entered by an Italian court; and,

5.   Defendants must agree to the reinstatement of the suit in this Court if the Italian court refuses to recognize Defendants' consent to jurisdiction.

It is further **ORDERED and ADJUDGED** that this matter is **DISMISSED.**  The Clerk shall **CLOSE** the case.

**DONE and ORDERED** in Fort Lauderdale, Florida, this 25th day of September 2012.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies:        Counsel of record